Argued and submitted February 11, 1999, affirmed October 18, 2000,
petition for review denied March 7, 2001 (331 Or 674)

## Linda BOYD,
*Respondent,*

*v.*

## George ESSIN,
*Appellant.*

## (18-98-09414; CA A102768)

12 P3d 1003

William N. Kent argued the cause and filed the briefs for appellant.

Nyla L. Jebousek, Lane County Legal Aid Service, argued the cause and filed the brief for respondent.

Before Edmonds, Presiding Judge, and Armstrong and Kistler,* Judges.

KISTLER, J.

Armstrong, J, dissenting.

* Kistler, J., *vice* Warren, P. J., retired.

**KISTLER, J.**

The trial court issued a permanent stalking protective order enjoining respondent George Essin from contacting petitioner Linda Boyd.[1] On appeal, respondent argues that the record does not establish a sufficient basis for the order. We review *de novo* and affirm.

Petitioner and respondent were married. They had seven children. In May 1997, their second oldest son came home and found his father (respondent) and his sister arguing. The son explained that respondent was "trying to kick my sister out of the house and shoving her back down the hallway." The son stepped between respondent and his sister and "told him that he wasn't going to do that. That this was a house for the kids and the family." Respondent pushed his son down the hallway. At that point, the daughter said that someone should call 9-1-1. When the son tried to do so, respondent "slammed his [*sic*] down and grabbed the phone out of [his son's] hand and, uh, threw that down to[o] and shoved [his son] back to the door." The son testified, "[A]t that point, he head butted me. Uh, flung open the door, uh wrestled me out, um, pushed me down the sidewalk and hit me in the back of the neck." Respondent's actions that day were not unusual. Rather, as the son agreed, respondent's actions were "characteristic of his behavior as [the son] was growing up."

Approximately two months later, on June 24, 1997, the trial court issued a restraining order against respondent. As part of the order, the court found that "[p]etitioner [Linda Boyd] has been abused by respondent [George Essin] as defined in ORS 107.705" and that the abuse had occurred within 180 days. Abuse, as defined in ORS 107.705, means one of three things: (1) attempting to cause or causing bodily injury; (2) intentionally, knowingly, or recklessly placing another in fear of imminent bodily injury; or (3) causing another to engage in involuntary sexual relations by force or threat of force. *See* ORS 107.705(1) (defining abuse). The

---

[1] The trial court had issued a temporary stalking protective order on May 20, 1998, which expired on June 8, 1998. We refer to the parties as they were designated below. *See* ORAP 5.15.

restraining order does not specify the particular way in which respondent abused petitioner. Respondent, however, told his anger management counselor that "he believes he had an anger problem during the spring and summer of 1997," the period during which the restraining order was issued. Petitioner told the counselor, more specifically, that respondent "threatened her once with a gun, and once with a baseball bat."[2]

After the restraining order issued, the parties separated. Approximately ten months later, their marriage was dissolved. Petitioner testified that, after they separated, respondent confronted her at public events. One time, he stood by the door when she tried to leave church. She testified that she walked by him quickly and went to pick up one of the children but "three times before I could make it to the van [respondent] was standing between me and my children or between me and the van." Sometimes, respondent would try to speak to her. According to petitioner, "it usually starts off nice." "He tells me that he loves me and that he will never have anyone else. And he doesn't know how he'll go on without me and then he becomes angry and he goes from one extreme to the other." When asked whether respondent had threatened her physically when he got angry, petitioner answered: "Not in public, no, he doesn't. Yes, in private many times."

When asked whether respondent had confronted her only at their church and at their children's school events, petitioner answered, "[N]ow [that] he can't come by my house anymore I don't see his vehicle going by my house multiple times per day. In fact, since th[e temporary] stalking order has been in place it has been a relief. I went to my daughter's concert and I got to hear my oldest daughter sing."

---

[2] Respondent told his counselor and also testified at the hearing on the stalking protective order that he had "never threaten[ed his] wife with any physical objects or * * * str[uck] her." Both respondent's statements and his testimony are inconsistent with the facts adjudicated as part of the restraining order, as well as the trial court's implicit credibility determination in this case. We note that respondent's anger management counselor reported, in a letter to respondent's attorney, that respondent feels "a bit more in control of his emotions" now and that, based on what father and some of the children reported, "this doesn't appear to be a chronic, long-term problem, but rather, a reaction to situational factors." As explained below, respondent's conduct suggests that the problem has not yet resolved.

After their separation, petitioner began getting telephone calls in the middle of the night.[3] No one would respond when she answered. Because petitioner could not be sure who was calling her, she got caller ID. After that, she knew when respondent was calling. Sometimes respondent called to speak to the children, which the restraining order permitted him to do.[4] Other times, he called at odd hours. He called at 3:51 in the morning, he called when the children were not in, or he called when petitioner was supposed to be at work. Petitioner's witness testified:

"I've been to your house on numerous occasions when [respondent] has made repeated, numerous phone calls where I could hear him yelling and screaming at you and you would be asking him to please not call you and hanging up. And then, you know, there would be another immediate phone call with him, you know. Saying, you know, I didn't hear what he said but it was, you know, I could hear him yelling. And then you eventually having to take the phone off the hook."

Shortly before petitioner filed for a stalking protective order, her neighbors saw respondent parked outside petitioner's house in his car, more than 1,000 feet from the house as the restraining order required. He was watching her home with binoculars. He drove away immediately after being spotted. When one of the neighbors saw him the next day, respondent said that he "had to document something," although he testified at the hearing that he was trying to see if petitioner was home so that their son could go to church with her.

The civil stalking statute authorizes a court to issue a stalking protective order against someone who intentionally, knowingly, or recklessly engages in "repeated and unwanted contact" with another person that alarms or coerces that person. ORS 30.866(1)(a).[5] The resulting alarm

---

[3] Respondent apparently believed that petitioner was seeing other men after their separation; he told their son "that he's driven by men's houses before that he thinks [petitioner's] involved with."

[4] The restraining order, which was incorporated in the dissolution judgment, permitted respondent to call petitioner's home to talk to their children but did not permit him to call petitioner.

[5] Two or more contacts constitute "repeated" contacts. ORS 163.730(7) (defining terms for both the civil and criminal stalking statutes).

or coercion must be objectively reasonable. ORS 30.866(1)(b). Finally, the contact must cause the person to have a reasonable apprehension regarding his or her personal safety or the safety of the person's immediate family or household. ORS 30.866(1)(c).

■■ Some of the contacts that cause alarm may involve communication. *See* ORS 163.730(3) (defining the term "contact");[6] *State v. Rangel*, 328 Or 294, 300, 977 P2d 379 (1999). Others may not. *See id.* When a party relies on contacts that involve expression to obtain a stalking protective order, the courts have required that a more stringent standard than the one set out in the statute be met to avoid overbreadth problems. *See id.* at 301; *Hanzo v. deParrie*, 152 Or App 525, 542, 953 P2d 1130 (1998), *rev den* 328 Or 418 (1999). As the court also explained in *Rangel*, however, "[n]o overbreadth problem arises if none of the contacts on which the [party seeking the order] relies to establish stalking involves communication." *Rangel*, 328 Or at 300; *accord Delgado v. Souders*, 146 Or App 580, 586, 934 P2d 1132, *rev allowed* 326 Or 43 (1997). Contacts that do not involve expression only need to satisfy the less stringent statutory standard. *Delgado*, 146 Or App at 586.

---

[6] ORS 163.730(3) defines "contact" for purposes of ORS 30.866. It provides:

" 'Contact' includes but is not limited to:

"(a) Coming into the visual or physical presence of the other person;

"(b) Following the other person;

"(c) Waiting outside the home, property, place of work or school of the other person or of a member of that person's family or household;

"(d) Sending or making written communications in any form to the other person;

"(e) Speaking with the other person by any means;

"(f) Communicating with the other person through a third person;

"(g) Committing a crime against the other person;

"(h) Communicating with a third person who has some relationship to the other person with the intent of affecting the third person's relationship with the other person;

"(i) Communicating with business entities with the intent of affecting some right or interest of the other person;

"(j) Damaging the other person's home, property, place of work or school; or

"(k) Delivering directly or through a third person any object to the home, property, place of work or school of the other person."

■ The record in this case contains numerous contacts that could potentially give rise to a stalking protective order. Some of those contacts involve expression. Others do not. We need not decide whether the expressive contacts rise to the level that *Rangel* requires in order to affirm the trial court's decision. At least three of the nonexpressive contacts suffice. First, respondent assaulted their son in May 1997. ORS 30.866(1)(a) permits a stalking protective order to be based on an alarming contact with a member of the petitioner's immediate family. Respondent's assault clearly caused petitioner to have a "reasonable apprehension regarding the personal safety of * * * a member of [her] immediate family," ORS 30.866(1)(c), and there can be little dispute that petitioner's alarm was objectively reasonable, ORS 30.866(1)(b).[7]

Because the second and third contacts raise related issues, we discuss them together. Petitioner saw respondent drive by her home "multiple times per day" before the temporary stalking protective order was issued. Additionally, petitioner's neighbors saw respondent parked outside of her home watching it with binoculars. The term " 'contact' includes but is not limited to * * * [c]oming into the visual * * * presence of the other person." ORS 163.730(3)(a). Respondent clearly came within petitioner's visual presence when she saw him drive by her home. *See State v. Maxwell*, 165 Or App 467, 474, 998 P2d 680 (2000) (defining the phrase "visual presence" as capable of being seen). Respondent did not, however, come within petitioner's visual presence when he was watching her home with binoculars; the record does not establish that respondent was capable of being seen from petitioner's house. *See id.*[8] The other potentially applicable definition of contact is "[w]aiting outside the home * * * of the person." ORS 163.730(3)(c). The legislature's use of the gerund "waiting," however, implies a durational requirement,

---

[7] The dissent reasons that because this contact occurred before petitioner and respondent separated, it was not an "unwanted" contact and may not be considered in determining whether to issue a protective stalking order. The dissent's reasoning sweeps too broadly. Not every contact that occurs before separation is wanted.

[8] Petitioner did not testify that she either did or could see respondent watching her. And, in light of respondent's use of binoculars to see petitioner, the record does not suggest that she could have seen him without some comparable device.

and there is no evidence in this record of how long respondent had been parked outside petitioner's home.

■ Even if watching petitioner through binoculars does not come within the express terms of ORS 163.730(3)(a) and (c), that is not the end of the inquiry. ORS 163.730(3) provides that the term " 'contact' includes but is not limited to" a list of defined acts. *See* n 6 above. The fact that watching someone with binoculars is not one of the listed acts does not necessarily preclude a court from relying on it as a basis for issuing a stalking protective order. In determining whether respondent's act qualifies as a contact, we look initially to the ordinary understanding of that term. *State v. K.P.*, 324 Or 1, 7-8, 921 P2d 380 (1996).

*Webster's Third New Int'l Dictionary*, 490 (unabridged ed 1993), defines contact, in relevant part, as:

> "**2 a**: association or relationship (as in physical or mental or business or social meeting or communication) ‹students and teachers in daily-› ‹Japan's new - with Europe› : direct experience through the senses ‹a mental patient's infrequent - with reality› **b**: a condition or an instance of meeting, connecting, or communicating (ordinary men made to feel a direct - with God—H.S. Canby› ‹keep in - with the other members› ‹neither party made any - with the other› ‹made - with the enemy›"

That definition establishes that, at its core, contact involves a direct communication or a meeting. The - definition also makes clear, however, that the term may have a broader reach. The use of the phrase "association or relationship" to define "contact" implies that a contact need not be a direct communication. Rather, it may consist of acts that give rise to a relationship between two persons.

■ In light of the variety of meanings that a word may have, dictionary definitions sometimes provide only the starting point for analysis. *See State v. Stoneman*, 323 Or 536, 546, 920 P2d 535 (1996). It is often necessary to examine the context in which the legislature has used the word to determine its intended meaning. *See id.* Here, the statute provides that " 'contact' includes but is not limited to" eleven specific acts. Those enumerated acts provide a guide for determining the type of other acts the term includes. *See*

*Gaston v. Parsons,* 318 Or 247, 253, 864 P2d 1319 (1994) (under the doctrine of *ejusdem generis,* the general will partake of the same characteristics as the specific examples); *cf. State v. Haynes,* 149 Or App 73, 77, 942 P2d 295 (1997), *rev den* 328 Or 275 (1999) (recognizing that it is "fairly common for the legislature to specify that a statutory term includes something that does not fit neatly into what the term generally means"). Many of the specific acts that the legislature listed involve a direct oral or visual connection between a petitioner and a respondent. *See* ORS 163.730(3)(d), (e), and (f). Others, however, do not require that sort of direct connection. *See* ORS 163.730(3)(c) and (g). It is sufficient if the act, when learned, gives rise to an unwanted relationship or association between the petitioner and the respondent.[9] *See id.*

■ Even though watching petitioner's home with binoculars may not fall within the specific acts listed in ORS 163.730(3), it is similar in both kind and effect to the acts that the legislature has said are encompassed within the term "contact." It shows an unwanted relationship or association between petitioner and respondent, and it is precisely the kind of contact that the statute was intended to prevent.

Having concluded that both driving by petitioner's home and watching her with binoculars are contacts within the meaning of ORS 163.730(3), we turn to the question whether petitioner was subjectively alarmed and whether her alarm was objectively reasonable. Petitioner testified that "it has been a relief" since the temporary stalking order issued and respondent no longer drove by her home "multiple times per day." She also testified that she "became very concerned" when she learned that petitioner was also watching her home with high-powered binoculars. To be sure, petitioner did not repeat the words of the statute and say that she had been subjectively alarmed. But we infer from her testimony, in light of the nature of respondent's contacts and his

---

[9] The fact that an act constitutes a "contact" within the meaning of the statute is, of course, not dispositive. Rather, the focus of the statutory test is whether the victim was reasonably alarmed by the contact and had a reasonable apprehension for his or her safety or the safety of the victim's family. *See* Tape recording, House Subcommittee on Crime and Corrections, SB 833, Feb 24, 1993, Tape 33, Side A (remarks of Representative Tarno); Tape recording, SB 833, Senate Judiciary Committee, May 5, 1993, Tape 142, Side A (remarks of Representative Mannix).

history of assaultive behavior towards petitioner, that she was in fact alarmed.[10] *See State v. Belt*, 325 Or 6, 10-11, 932 P2d 1177 (1997).

We also conclude that it was objectively reasonable for petitioner to be alarmed. Respondent has a history of violent and abusive behavior towards his family. In 1997, he assaulted his son, and his son testified that respondent's behavior that day was characteristic. Respondent had also threatened petitioner once with a gun and once with a baseball bat, and the court had adjudicated, as part of its earlier restraining order, that respondent had abused petitioner. Petitioner testified that although respondent had not threatened her physically in public, he had done so in private many times. Indeed, respondent himself testified that he had given his neighbor his guns "because [petitioner] had, had indicated that I threatened her."[11] We recently explained that contacts that might appear innocuous when viewed in isolation often take on a different character when viewed either in combination or against the backdrop of one party's assaultive behavior towards the other. *Weatherly v. Wilkie*, 169 Or App 257, 263, 8 P3d 251 (2000). This case illustrates that proposition. Viewed in context, respondent's acts of repeatedly driving by his former wife's house, and then watching her with binoculars, reasonably caused her alarm and also to have a reasonable apprehension for her personal safety.

In *Delgado*, the respondent lived one block from the petitioner. 146 Or App at 582. He repeatedly appeared in

---

[10] The dissent reasons that we should not infer petitioner's state of mind in the absence of explicit testimony. To do so, it reasons, renders the subjective and objective components of the stalking statute redundant. A person's state of mind, however, is rarely expressed and usually inferred. *See Belt*, 325 Or at 10-11. Moreover, because a trier of fact is free not to infer subjective alarm, the redundancy the dissent perceives does not exist.

[11] The dissent does not dispute that we may rely on respondent's statements as context to determine whether his nonexpressive conduct constitutes prohibited statutory contacts. The dissent faults us, however, for "fail[ing] to acknowledge that we may not consider any of [respondent's expressive] conduct as prohibited [statutory] contact[s] because none of it [satisfies the standard that Article I, section 8, imposes]." 170 Or App at 532. The dissent's point is not completely clear. Respondent's nonexpressive conduct, viewed in context, establishes sufficient prohibited statutory contacts to support a stalking protective order. There is no reason to reach the constitutional question, as the dissent apparently would, whether respondent's expressive conduct—standing alone—would also be sufficient to warrant issuance of a stalking protective order; settled principles counsel against reaching constitutional issues unnecessarily.

front of her building and on public sidewalks where she was walking. *Id.* Once, he cut across the street and passed within two or three feet of her. *Id.* Another time, he appeared suddenly within a foot of her on a secluded part of the Oregon State University campus. *Id.* A number of times, he placed himself near her at the school library. *Id.* He never said anything to her although once he appeared on the verge of saying something. *Id.* The petitioner in *Delgado* experienced severe anxiety as a result of the respondent's actions even though there was no evidence that the respondent had previously been violent or assaultive.

In *Delgado*, we rejected the respondent's argument that his "conduct was nonculpable or innocuous and was of a kind that [the petitioner] should have been prepared to accept." *Id.* at 584. We held that his conduct was sufficient to warrant the issuance of a stalking protective order. In this case, respondent's acts of driving by petitioner's home and watching her with binoculars are similar in character to the respondent's acts in *Delgado*, and respondent's history of assaultive behavior, which was absent in *Delgado*, confirms that petitioner was reasonably alarmed by respondent's conduct. If a stalking protective order was warranted in *Delgado*, it is also warranted here.

Affirmed.

**ARMSTRONG, J.,** dissenting.

I respectfully dissent. The majority reaches the conclusions that it does by making questionable inferences from oblique references in a woefully inadequate record. It uses those inferences to paint a very disturbing picture, but it fails to divulge that that picture is nothing more than mere conjecture. Moreover, it uses the facts involving respondent's expressive conduct to buttress its conclusion that respondent has repeatedly engaged in unwanted contact with petitioner, but it fails to acknowledge that Article I, section 8, of the Oregon Constitution bars us from considering that conduct as actionable conduct under the anti-stalking statute.[1] The

---

[1] As discussed below, I view respondent's acts of driving by petitioner's house and watching her house with binoculars as the only relevant contacts under ORS 30.866. Moreover, because there is insufficient evidence that his driving by her house would alarm a reasonable person, the only relevant incident is the one with the binoculars.

shortcomings in the majority's analysis cannot be ameliorated by its emotional appeal.

The first and most important flaw in the majority's opinion is its failure to address the fact that petitioner offered no evidence of the subjective alarm required by ORS 30.866. Although the majority states that "[i]f a stalking protective order was warranted in *Delgado*, it is also warranted here," 170 Or App at 530 (citing *Delgado v. Souders*, 146 Or App 580, 934 P2d 1132, *rev allowed*, 326 Or 43 (1997)), the question is not merely whether respondent's acts are sufficient to produce reasonable alarm, but also whether they actually did so. Unlike respondent in this case, the respondent in *Delgado* did not dispute that the petitioner actually experienced alarm. Here, however, respondent argues explicitly that petitioner failed to prove subjective alarm or coercion. Indeed, the transcript is devoid of any testimony that any of respondent's acts caused petitioner to experience "apprehension or fear resulting from the perception of danger." ORS 163.730(1) (defining "alarm").[2] The closest that petitioner comes to asserting that she experienced subjective alarm is at the end of her testimony when she indicated that her life has been more peaceful since the issuance of the temporary stalking protective order. An absence of peace, however, need not entail the fear or apprehension required here.

The void in petitioner's testimony regarding the element of subjective alarm requires us to address whether subjective alarm can be inferred under these circumstances. That issue has not been addressed with regard to stalking protective orders. Although factfinders may infer subjective states of mind, the inference is most appropriate when one party has the burden of proving the other's subjective state of mind, as in the employment discrimination context. When, as here, the party whose subjective state of mind is at issue is also the party seeking a judgment from the court, a failure to testify to feelings of subjective alarm should lead to the inference that the required state of mind is not present. Nonetheless, the majority opinion breezes through the question of subjective alarm as though it can be presumed simply from

---

[2] Petitioner has not argued that respondent's acts were coercive or potentially coercive.

the nature of the conduct it ascribes to respondent. However, if subjective alarm were regularly inferred from objectively alarming behavior, the statute's requirement of subjective alarm would become superfluous; once the statutory requirement of objectively alarming behavior had been established, subjective alarm would be presumed and there would never be a need to address that requirement separately (except, of course, in the unlikely event that a petitioner denied feelings of subjective alarm). We have repeatedly said that statutes should be interpreted so as to give effect to all of their provisions. *See, e.g., Quintero v. Board of Parole,* 329 Or 319, 324, 986 P2d 575 (1999). That principle holds true here. The majority errs in inferring subjective alarm from the nature of respondent's behavior. Without evidence of subjective alarm, the stalking protective order in this case should not stand.

The majority's analysis suffers from other flaws as well. As mentioned previously, it uses the facts of respondent's communicative conduct to embellish its overall picture of respondent as an unpleasant person, but it fails to acknowledge that we may not consider any of that conduct as prohibited contact because none of it rises to the level of "unambiguous" and "unequivocal" threats of serious physical harm that are "specific to the addressee." *Hanzo v. deParrie,* 152 Or App 525, 543, 953 P2d 1130 (1998), *rev den* 328 Or 418 (1999) (citations and internal quotation marks omitted). Thus, the facts that respondent has said "hi" to petitioner, has told her he loves her and will never love anyone else, has called her a whore and an adulterer, and has threatened to take her back to court cannot form part of the implicit bases of this court's decision on the merits. Whatever we may personally think of an ex-husband's name calling, it is simply beside the point. To enjoin respondent's conduct in part to prevent him from continuing to communicate with petitioner in an unpleasant manner would violate Article I, section 8, of the Oregon Constitution.

Another respect in which the majority errs is in taking petitioner's testimony out of context. Read as a whole, her testimony about respondent's behavior is quite equivocal. The quotations chosen by the majority, however, give the impression that her testimony regarding respondent is much more consistent. For instance, the majority quotes petitioner

as saying that respondent has threatened her in private "many times." However, it ignores the fact that the exchange between her and respondent's attorney raises substantial doubt about whether the threats to which she alludes occurred within the relevant time period for the purposes of the stalking protective order.[3] The majority's rendition of petitioner's testimony on that issue also fails to account for petitioner's earlier equivocations. That segment of petitioner's testimony centered on her interactions with respondent at school events and in other public places. According to petitioner, what is objectionable about those encounters is that respondent threatened to take her back to court and threatened her with other "verbal" harm. In fact, petitioner refers to respondent's statements that he will take her back to court as "threats" so often throughout the transcript that one has to wonder whether she understands at all that, for purposes of a stalking protective order, only threats of physical harm are relevant.[4]

A final problem with the majority's analysis is that it fails to distinguish between contacts between respondent and petitioner that occurred when the parties lived together and those that occurred after their separation. As we indicated in *Wayt v. Goff*, 153 Or App 347, 353, 956 P2d 1063 (1998), contacts that are initiated by the complaining party cannot properly be described as "unwanted" within the

---

[3] *See* ORS 30.866(6).

[4] Petitioner also referred to respondent's statement that he was going to come to the house to remove his belongings, rather than hiring someone to do so, as a threat. Moreover, in another part of her testimony, petitioner stated that her "life has been threatened in front of the children." When asked to describe the incident more specifically, however, she related an instance when respondent asked one of the children to have petitioner come outside so that he could talk to her. When she did so, he tried to get her to sign a tax form. She refused, and he called her a "whore" and an "adulteress." At the very least, such inconsistencies call into question petitioner's ability to describe events objectively. In fact, the transcript is devoid of any descriptions of physical threats made by respondent. Petitioner's witness, who overheard and listened in on respondent's phone calls to petitioner's home, admitted that none of the calls involved physical threats against petitioner. Finally, although the majority refers to a letter from respondent's psychologist that states that petitioner told him that respondent had physically threatened her, it fails to acknowledge that the letter contains no indication of when those threats allegedly occurred. The letter also is quite positive in its assessment of respondent's psychological state. It states that "in general, [respondent] has good control over his emotions" and that the four youngest children had "indicate[d] that they would rather live with their father and 'visit' their mother."

meaning of ORS 30.866, although the nature of the contact may be unwanted. Thus, any contacts that occurred while the parties lived together, such as the incident between respondent and his son, cannot form the basis of a stalking protective order. That leaves the incident with the binoculars and respondent's driving by petitioner's house as the only relevant contacts. In light of the fact that the parties live in a very small town, and therefore driving by petitioner's house may be difficult to avoid, I would view only the binoculars incident as potentially alarming. Accordingly, I would conclude that respondent has not engaged in repeated unwanted contacts as ORS 30.866 requires.

Because petitioner has not presented evidence of subjective alarm and has not shown that respondent has engaged in repeated unwanted contacts, the stalking protective order should be vacated. I would reverse.