TOOKEY, J.
*108 *817 Respondent appeals a stalking protective order (SPO) that the trial court entered against him.[1] On appeal, respondent contends, among other points, that (1) the trial court erred in "finding that objectively non-threatening text messages constituted *** unwanted contact" for purposes of the civil stalking statute, ORS 30.866 ; (2) the record contained insufficient evidence to support the trial court's finding that respondent was "tracking" petitioner's whereabouts; and (3) in any event, "tracking" is not a "contact" sufficient to support entry of an SPO under ORS 30.866. We conclude the trial court did not err and affirm.
"We review the trial court's factual findings for 'any evidence' and its legal conclusions for errors of law." Christensen v. Carter/Bosket , 261 Or. App. 133, 135, 323 P.3d 348 (2014). "As in other equitable proceedings, we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." Id. (internal quotation marks omitted). We state the facts consistently with that standard.
Petitioner and respondent were romantically involved from May 2010 until November 2014. During that time, they had a child together, L. Over the course of their relationship, respondent was physically and verbally abusive to petitioner. The physical abuse included, among other things, grabbing and squeezing petitioner's throat, throwing "anything that he could get his hands on" at petitioner-e.g. , shovels, garden pots, and a box of chalk-pushing petitioner to the ground, pushing a large oil heater over onto petitioner's foot, and stomping on petitioner's feet. The verbal abuse included, among other things, threatening that, if petitioner "hurt his feelings," he would "hurt [her] ten times worse," telling petitioner that she was "ugly" and that her "feet were disgusting," and accusing petitioner of being a *818 "whore." Some of respondent's abusive conduct occurred in front of L.
Additionally, during their relationship, respondent tried to exercise control over petitioner. For example, he attempted to control what she wore, to whom she talked, who she was around, and how often she was on her phone. If petitioner did not do what respondent wanted, he would "punish" her by, for example, taking her cell phone, car keys, or money, so that she could not pay bills.
In November 2014, after petitioner and respondent separated, petitioner and respondent met in a parking lot for respondent to return some of petitioner's possessions. When their conversation did not go as respondent had wanted it to go, he "took his body and slammed [petitioner's] body into [petitioner's] car." L was in the backseat of the car when that occurred. During the SPO hearing, petitioner testified that this made her feel "terrified" because (1) respondent had previously "hurt" petitioner and "grabbed her throat" and (2) it occurred in a public place, "in front of people," which demonstrated to petitioner that respondent "had no fear."
Also in November 2014, petitioner filed for and received a temporary restraining order against respondent. In December 2014, respondent and petitioner agreed to a "mutual no contact order."
Respondent, however, did not comply with the terms of the mutual no contact order. Instead, he continued to call petitioner and "say abusive things" to her. He also frequently sent petitioner unwanted and "abusive" text messages. As a result of this conduct, sometime around July 2015, petitioner changed her phone number. She did not give respondent her new phone number.
Subsequently, as described below, respondent began to send petitioner text messages that indicated that he was monitoring petitioner's email communications and tracking her whereabouts.
In July 2015, after petitioner had changed her phone number, she emailed her new phone number to a Department of Human Services caseworker from her personal email *109 *819 account. Petitioner did not share her personal email account with respondent, did not want him accessing her personal email account, and had never given him permission to access her personal email account. Nevertheless, after petitioner emailed her new phone number to the caseworker, respondent began sending text messages to petitioner's new phone number.
In May 2016, after taking L to a soccer clinic, petitioner received a text message from respondent indicating that respondent knew that petitioner had taken L to the soccer clinic and indicating that respondent had pictures of L that were taken during the soccer clinic. This "[r]eally scared" petitioner because she did not "know how [respondent] knew where [she and L] were."
Shortly after receiving the text message from respondent regarding the soccer clinic, petitioner emailed her attorney from her personal email account. Petitioner then received a text message from respondent indicating he had read the email that she had sent to her attorney. In the text message, respondent also accused petitioner of "making up lies," and called petitioner a "liar," a "deadbeat mom," and a "low life." Petitioner was "alarmed" because she did not know how respondent had read the email between her and her attorney.
Also in May of 2016, respondent sent a text message to petitioner asking her what had caused a scar on L's cheek. In actuality, L had the remnants of a temporary tattoo on his cheek. Petitioner was "concerned" and "afraid" because, at the time, respondent did not have visitation with L, and, according to petitioner, respondent would have "had no way of knowing if [L] had anything on his cheek." Petitioner was also "concerned" because (1) she did not know if respondent was following her, or if she and L were being photographed again and (2) respondent had previously "retaliated" against petitioner when he thought L was injured. That retaliation included threatening to hurt petitioner. Petitioner explained during the SPO hearing what frightened her was "mostly the fact" that she did not know how respondent was aware that L had something on his cheek.
*820 Additionally, although the date is unclear from the record, respondent sent a text message to petitioner at the "exact moment" that she was dropping L off at school, asking her to tell L to have a good day. Petitioner did not drop L off at school at the same time every day, and she did not know how respondent would know she was at L's school at that moment. Petitioner testified that respondent also sent her text messages telling her that respondent "knows where [she is] at that time" and "knows everything."
On or about May 20, 2016, petitioner logged into the Find My iPhone application on her cell phone and discovered that both her cell phone and respondent's cell phone were "logged into [petitioner's] email account," which led petitioner to believe that respondent had been tracking her whereabouts using the Find My iPhone application.[2] Petitioner testified during the SPO hearing that, by using her email address and password, in conjunction with the Find My iPhone application, respondent could track the location of petitioner's cellphone. During the SPO hearing, petitioner submitted into evidence a screenshot from her cell phone reflecting both petitioner's and respondent's cell phones listed in petitioner's Find My iPhone application.
On May 28, 2016, petitioner texted respondent, asking that he not contact her. That same day she went to the Eugene Police Department to report respondent's conduct. Officer Greg Calef of the Eugene Police Department then emailed respondent, informing him that petitioner had alleged that respondent had sent unwanted text messages to her *110 and had provided evidence that would "implicate him potentially in a computer crime."
On June 16, 2016, petitioner filed a petition for an SPO, and a temporary SPO was issued by the trial court.
*821 The hearing for a permanent SPO was held on July 14, 2016. During that hearing, respondent testified that he had accessed petitioner's personal email account. He denied, however, that he had tracked petitioner's whereabouts using the Find My iPhone application.
At the end of the hearing, the trial court concluded that the record supported the issuance of a permanent SPO. It first determined that the "November [2014 physical] contact [with petitioner] *** was unwanted contact." It noted that it believed "petitioner credible on at least being pushed, and that that was unwanted contact that caused her alarm or coercion."[3]
The trial court next determined that respondent's tracking of petitioner was an "unwanted contact" and that respondent's denial of that conduct was not credible. Specifically, the court determined:
"[T]aken together[, all the text messages] reveal *** that the respondent[,] who had previously been physically aggressive with the petitioner[,] was continuing to track her whereabouts, track her-her doings, all of her goings on. He was, and this is non-expressive conduct on his part. This is logging into her accounts. I find it credible. I don't find his testimony particularly credible on the issue of whether he was using [F]ind [M]y iPhone. I saw that he was, had at one point been logged onto that, and I see evidence in his own text messages that he knows where she is, and that lends credibility to the idea that he is nonverbally tracking her whereabouts, using her phone, using an app on the phone to know where she is and let her know that he knows what she's doing and where she is, and that that would reasonably place a person in her situation in apprehension for her physical safety ***."
The trial court also determined that the text messages that respondent sent to petitioner did not themselves meet the requirements for the issuance of an SPO:
"What I have are some text message that I do not see as threats. They are the kind that I routinely turn down *822 in the Stalking Order docket because they threaten and they're rude, and abuse, verbally abusive, but whether they cause her fear for her physical safety is quite doubtful. They don't reflect well on [respondent], *** but the actual words of those text messages don't meet the requirement for stalking."
The court subsequently issued a written order, which contained the following findings:
"1. Respondent has engaged intentionally, knowingly, or recklessly in repeated and unwanted contact with the Petitioner or a member of the Petitioner's immediate family or household, and it was reasonable for Petitioner to be alarmed or coerced by this contact.
"2. It is objectively reasonable for a person in Petitioner's situation to have been alarmed or coerced by Respondent's contact.
"3. Respondent's repeated and unwanted contact caused the Petitioner reasonable apprehension regarding the Petitioner's own personal safety or the safety of a member of his/her immediate family or household.
"4. The unwanted contact occurred within two years of the filing of this action."
Oregon's civil stalking statute, ORS 30.866 (1), provides:
"A person may bring a civil action in a circuit court for a court's stalking protective order or for damages, or both, against a person if:
"(a) The person intentionally, knowingly or recklessly engages in repeated and unwanted contact with the other person or a member of that person's immediate family or household thereby alarming or coercing the other person;
"(b) It is objectively reasonable for a person in the victim's situation to have *111 been alarmed or coerced by the contact; and
"(c) The repeated and unwanted contact causes the victim reasonable apprehension regarding the personal safety of the victim or a member of the victim's immediate family or household."
*823 For a court to issue an SPO, the "statute requires that a petitioner demonstrate that there were two or more unwanted contacts with either the petitioner or a member of the petitioner's immediate family within the previous two years." Christensen , 261 Or. App. at 139, 323 P.3d 348 ; see also ORS 163.730(7) (providing definition of "repeated" for ORS 30.866 ). " '[E]ach contact must give rise to subjective alarm and that alarm must be objectively reasonable ***.' " Christensen , 261 Or. App. at 139, 323 P.3d 348 (quoting Blastic v. Holm , 248 Or. App. 414, 418, 273 P.3d 304 (2012) (brackets and omission in Christensen )). "Alarm," for purposes of ORS 30.866, means "to cause apprehension or fear resulting from the perception of danger." ORS 163.730(1). And, finally, the contacts, " 'cumulatively, [also] must give rise to subjective apprehension regarding the petitioner's personal safety or the personal safety of a member of the petitioner's immediate family or household, and that apprehension must be objectively reasonable.' " Christensen , 261 Or. App. at 139-40, 323 P.3d 348 (quoting Blastic , 248 Or. App. at 418, 273 P.3d 304 (brackets in Christensen )). In determining whether alarm and apprehension regarding personal safety are objectively reasonable, we may consider "previous contacts as context about the parties' relationship." Ragsdale v. Fleming , 265 Or. App. 342, 351, 336 P.3d 534 (2014).
As noted above, on appeal, respondent makes three principal arguments: First, the trial court erred in "finding that objectively non-threatening text messages constituted a threat that gave rise to a subjective and objectively reasonable alarm or coercion that constituted an unwanted contact for purposes of ORS [30.866]." Second, there was "no evidence presented at trial" that respondent had engaged "in electronically tracking the location of" petitioner. Finally, "tracking" is not a "contact," and contact is a necessary element for issuance of an SPO under ORS 30.866(1).
We are not persuaded by respondent's arguments. Respondent's first argument-that the trial court erred in "finding that objectively non-threatening text messages" constituted an "unwanted contact" for purposes of ORS 30.866 -fails because it starts with an incorrect premise, viz. , that the trial court determined that petitioner's text *824 messages constituted an "unwanted contact" for purposes of ORS 30.866. The trial court's ruling reflects, however, that the unwanted contacts on which it relied when concluding that petitioner was entitled to a permanent SPO were (1) respondent's November 2014 physical contact with petitioner and (2) respondent's electronic tracking of petitioner's whereabouts. Although the content of the text messages that respondent sent to petitioner was evidence that respondent was, in fact, tracking petitioner, the text messages themselves were not the contacts that provided the basis for the trial court's issuance of a permanent SPO.[4]
We also reject respondent's second argument-that there was no evidence presented during the SPO hearing that respondent had engaged in electronically tracking the location of petitioner. Contrary to respondent's contention, there was ample evidence *112 to support the trial court's finding that respondent was electronically tracking petitioner's whereabouts. That evidence includes (1) respondent's testimony that he had accessed petitioner's email account, (2) petitioner's testimony that such access, in conjunction with the Find My iPhone application, would allow respondent to track her cell phone, (3) a screenshot from petitioner's cell phone showing respondent's cell phone listed in petitioner's Find My iPhone application, and (4) the text messages that respondent sent to petitioner that indicated he knew her whereabouts during distinct events as or shortly after they happened. Although respondent denied during the SPO hearing that he had electronically tracked petitioner's location, the trial court determined that that denial was not credible, and we defer to that determination. See *825 Habrat v. Milligan , 208 Or. App. 229, 231, 145 P.3d 180 (2006) ("We defer to the trial court's implicit and explicit credibility determinations.").
Respondent's third argument-that "tracking" is not a "contact" for purposes of ORS 30.866(1) -fares no better. ORS 163.730(3) defines "contact" for purposes of ORS 30.866(1). It provides:
" 'Contact' includes but is not limited to :
"(a) Coming into the visual or physical presence of the other person;
"(b) Following the other person;
"(c) Waiting outside the home, property, place of work or school of the other person or of a member of that person's family or household;
"(d) Sending or making written or electronic communications in any form to the other person;
"(e) Speaking with the other person by any means;
"(f) Communicating with the other person through a third person;
"(g) Committing a crime against the other person;
"(h) Communicating with a third person who has some relationship to the other person with the intent of affecting the third person's relationship with the other person;
"(i) Communicating with business entities with the intent of affecting some right or interest of the other person;
"(j) Damaging the other person's home, property, place of work or school;
"(k) Delivering directly or through a third person any object to the home, property, place of work or school of the other person; or
"(L) Service of process or other legal documents unless the other person is served as provided in ORCP 7 or 9."
ORS 163.730(3) (emphasis added). Electronically tracking someone's whereabouts may not come within one of the provisions set forth in ORS 163.730(3)(a) to (L), but that is not dispositive, because the list of "contacts" in ORS 163.730(3) is preceded by the term "includes," which shows that the *826 list is "illustrative, not exhaustive." See State v. Shields , 184 Or. App. 505, 511, 56 P.3d 937 (2002), rev. den. , 335 Or. 355, 67 P.3d 937 (2003) ; see also State v. Fox , 262 Or. App. 473, 483, 324 P.3d 608, rev. den. , 356 Or. 163, 334 P.3d 971 (2014) (noting that " '[m]eans' is used in the definition if the definition restricts or limits the meaning of a word," while " '[i]ncludes' is used if the definition extends the meaning" (quoting Office of Legislative Counsel, Bill Drafting Manual § 7.2 (2012) (some internal quotation marks omitted))).[5]
In Boyd v. Essin , 170 Or. App. 509, 516-17, 12 P.3d 1003 (2000), rev. den. , 331 Or. 674, 21 P.3d 96 (2001), we examined the meaning of "contact," as that term is used in ORS 163.730(3). After analyzing the dictionary definition of "contact" and the text of ORS 163.730(3), as well as context, we concluded that "contact" does not require a "direct oral or visual connection between a petitioner and a respondent." Id . Instead, it "is sufficient if the act, when learned, gives rise to an unwanted relationship or association between the petitioner and the respondent." Id. ; see *113 also Christensen , 261 Or. App. at 140, 323 P.3d 348 (noting "[a] 'contact' includes almost any interaction with the petitioner"); Shields , 184 Or. App. at 511, 56 P.3d 937 (concluding that the defendant making telephone calls to the victim in which the defendant did not speak, when such calls were answered by the victim, was a "contact" because it "created a relationship or association" between the defendant and the victim that the victim "clearly did not want"). In Boyd , we determined that "watching petitioner's home with binoculars" from over 1,000 feet away is a contact "within the meaning of ORS 163.730(3)," even though it "may not fall within the specific acts listed in ORS 163.730(3)." Id. at 513, 516-17, 12 P.3d 1003. We so concluded because that act "is similar in both kind and effect to the acts that the legislature has said are encompassed within the term 'contact,' " it "shows an unwanted relationship or association between petitioner and respondent," and was "precisely the kind of contact that the statute was intended to prevent." Id. at 517, 12 P.3d 1003. *827 In this case, we conclude that electronically tracking someone's whereabouts is a "contact" within the meaning of ORS 163.730(3). It is similar in kind and effect to following a person, ORS 163.730(3)(b), in that it (1) provides real-time information about a person's whereabouts and (2) may lead a person to have concerns that they are being followed, as was the case with petitioner here. It is also the kind of conduct that the statute was intended to prevent. See State v. Meek , 266 Or. App. 550, 556-57, 338 P.3d 767 (2014) (noting ORS 163.730(3) was enacted as part of a "general anti-stalking scheme" with the intent of creating a "flexible[ ] and effective statutory scheme *** to enable law enforcement officers, courts, and victims to combat stalking"); Dania Bardavid, Marissa Chiarolanzio & Allison Strittmater, Domestic Violence , 17 Geo. J. Gender & L. 211, 242-43 (2016) (characterizing tracking a victim's location via the victim's cell phone as stalking); Danielle Keats Citron, Spying Inc. , 72 Wash. & Lee L. Rev. 1243, 1251, 1257 (2015) (characterizing the location of someone via a cell phone, a GPS device, or surveillance software as stalking, and noting that "[p]hysical harm is a serious peril when abusers have access to victims' activities and whereabouts"). And, at least in this case, it shows an unwanted relationship or association between petitioner and respondent.[6]
As noted above, respondent does not challenge the trial court's determination that respondent's November 2014 physical contact with petitioner was legally sufficient to serve as a predicate contact for issuance of a permanent SPO pursuant to ORS 30.866(1). Accordingly, we consider whether the record in this case was legally sufficient to permit the trial court to use respondent's electronic tracking of petitioner as a predicate contact for issuance of a permanent SPO pursuant to ORS 30.866(1). We conclude that it was.
Specifically, we conclude that the record in this case is legally sufficient to support the trial court's determination *828 that such contact was unwanted and subjectively alarmed petitioner: she testified that it "really scared" and "concerned" her that respondent knew her location, particularly because she believed that the information gleaned by respondent as a result of that tracking might lead respondent to "retaliate" against her.[7] See ORS 163.730(1) (defining "[a]larm" as "apprehension or fear resulting from the perception of danger"); Boyd , 170 Or. App. at 517-18, 12 P.3d 1003 (considering *114 respondent's "history of assaultive behavior towards petitioner" to infer subjective alarm from petitioner's testimony). We also conclude that petitioner's alarm was objectively reasonable given respondent's history of conduct toward petitioner. See Boyd , 170 Or. App. at 518, 12 P.3d 1003 (explaining "that contacts that might appear innocuous when viewed in isolation often take on a different character when viewed either in combination or against the backdrop of one party's assaultive behavior," and holding that, in the context of the respondent's "history" of behavior towards his family, the petitioner's alarm and apprehension for her personal safety was objectively reasonable); Pinkham v. Brubaker , 178 Or. App. 360, 372, 37 P.3d 186 (2001) (when determining whether alarm was objectively reasonable, "unwanted contacts must be considered in the context of the parties' entire history").
We further conclude that the record is legally sufficient to support the trial court's determination that the unwanted contacts in this case caused petitioner apprehension regarding her personal safety and that that apprehension was objectively reasonable.
In sum, for the reasons stated above, we conclude that the trial court did not err in issuing the permanent SPO. Accordingly, we affirm.
Affirmed.

In civil stalking cases, we ordinarily refer to the parties by their designation in the trial court. King v. W. T. F. , 276 Or. App. 533, 534 n. 1, 369 P.3d 1181 (2016) (so stating).

"Find My iPhone * * * allows for real-time updates on * * * Apple product locations * * *." Brenda Baddam, Technology and Its Danger to Domestic Violence Victims: How Did He Find Me? , 28 Alb. L.J. Sci. & Tech. 73, 80 (2017) ; see also Jones v. United States , 168 A.3d 703, 735 (D.C. App. 2017) (Thompson, J., dissenting) (noting that "[c]ase law is replete with references to iPhone owners or law enforcement officers locating * * * iPhones by using the Find My iPhone app"); Baddam, 28 Alb. L.J. Sci. & Tech. at 80 (noting that someone with access to the information provided by Find My iPhone would be able to "stalk[ ] [a] victim[']s every move and readily have directions available to track down the victim.").

On appeal, respondent does not challenge the trial court's determination that respondent's November 2014 physical contact with petitioner was legally sufficient to serve as a predicate contact for issuance of a permanent SPO pursuant to ORS 30.866(1).

Defendant also suggests that the trial court should have applied the heightened standard for issuance of an SPO that is applicable when the unwanted contacts at issue are "expressive contacts." As we explained in Christensen , to "avoid constitutional overbreadth problems," when a contact is an "expressive contact"-that is, "one that involve[s] speech, either oral or written"-the contact must include a "threat," which means "a communication that instills in the addressee a fear of imminent and serious personal violence from the speaker, is unequivocal, and is objectively likely to be followed by unlawful acts." Christensen , 261 Or. App. at 140, 323 P.3d 348 (internal quotation marks omitted). Here, the relevant contacts-(1) respondent's November 2014 physical contact with petitioner and (2) respondent's electronic tracking of petitioner's whereabouts-are nonexpressive, and, accordingly, the less stringent statutory standard applies. Id. ("[W]here the act that causes alarm or coercion is based on the nonexpressive conduct, the less stringent statutory standard applies.").

Given our conclusion below that electronically tracking someone's whereabouts is a "contact" within the meaning of ORS 163.730(3), we do not specifically consider whether the respondent's conduct in this case would be sufficient under either ORS 163.730(3)(b), "[f]ollowing the other person," or ORS 163.730(3)(g), "[c]ommitting a crime against the other person."

As we observed in Boyd , 170 Or. App. at 517 n. 9, 12 P.3d 1003,
"[t]he fact that an act constitutes a 'contact' within the meaning of the statute is, of course, not dispositive. Rather, the focus of the statutory test is whether the victim was reasonably alarmed by the contact and had a reasonable apprehension for his or her safety or the safety of the victim's family."

That petitioner's alarm occurred when she read respondent's text messages and not at the precise moment respondent was electronically tracking her whereabouts does not take her reaction to the tracking outside of the scope of the statute. See Schiffner v. Banks , 177 Or. App. 86, 92, 33 P.3d 701 (2001) (noting "alarm or coercion must arise from the contact," but need not arise "contemporaneously with the contact"); Pinkham v. Brubaker , 178 Or. App. 360, 371, 37 P.3d 186 (2001) ("The fact that petitioner's reaction came when she learned of the unwanted contact, even though the contact had occurred months before, does not take her reaction outside the scope of the statute.").