Submitted on record and briefs September 7, affirmed December 19, 2001

Susan Lea PINKHAM,
*Respondent,*

*and*

Sydney Rebekah GREEN
and Sophie Rachelle Green,
Minor Children,
*Petitioners,*

*v.*

Michael Lee BRUBAKER,
*Appellant.*

00-1696-ZO; A111021

37 P3d 186

Kendra M. Matthews and Ransom Blackman LLP filed the brief for appellant.

Susan Lea Pinkham filed the brief *pro se* for respondent.

Before Haselton, Presiding Judge, and Linder and Wollheim, Judges.

LINDER, J.

## LINDER, J.

■     Respondent appeals from a judgment granting petitioner's requested permanent stalking protective order (SPO). *See* ORS 30.866.[1] The sole issue on appeal is the adequacy of the evidence to support issuance of the SPO. We review the facts *de novo, Hanzo v. deParrie,* 152 Or App 525, 537, 953 P2d 1130 (1998), *rev den* 328 Or 418 (1999), giving deference to the trial court's express and implicit credibility determinations.[2] We affirm.

    Respondent worked in the produce section of a grocery store in Ashland, Oregon, where petitioner shopped. Respondent first befriended Sydney, petitioner's youngest daughter, who was then nine years old. He would talk to her when she came into the store with her mother, frequently giving her samples of fruit and otherwise focusing attention on her. Sydney liked the attention and looked forward to seeing him at the store.

    Sometime after respondent and Sydney became friends, petitioner's domestic companion died of cancer. Petitioner's daughters told respondent of that death, after which respondent reached out to petitioner as well. He became a family friend and occasionally did things with petitioner and her daughters, such as coming to their home for dinner.

---

[1] We explained in *Hanzo v. deParrie,* 152 Or App 525, 527 n 1, 953 P2d 1130 (1998), *rev den* 328 Or 418 (1999):

> "In civil stalking proceedings, the party applying for relief is denominated the 'petitioner' and the party against whom the relief is sought is the 'respondent.' Obviously, that nomenclature can be confusing in an appeal like this, where the 'respondent' below is the appellant and the 'petitioner' below is the respondent. Nevertheless, for consistency and in accordance with our own rules governing designation of parties in briefs, ORAP 5.15, all references to 'respondent' are to deParrie and all references to 'petitioner' are to Hanzo."

Similarly, in this opinion, all references to respondent are to appellant Brubaker and all references to petitioner are to respondent on appeal, Pinkham.

[2] Respondent's statement of facts is comprehensive but frequently casts the facts and reasonable inferences that they may support in a way that favors respondent's version of what happened. The trial court implicitly found petitioner and her witnesses (*i.e.*, her older daughter and her former husband) to be more credible. We therefore have resolved those factual disputes in petitioner's favor and describe the facts accordingly.

Eventually, respondent let petitioner know that he was trying to find an apartment in Ashland. At that time, he was living in Grants Pass but was having difficulty with the commute because of mechanical problems with his car. Petitioner initially let respondent store some of his belongings in her garage. When respondent was unable to find an apartment, petitioner also let him stay in her home. Petitioner and respondent agreed that the arrangement was temporary.

The arrangement worked well at first. Petitioner considered respondent a pleasure to be around, grew fond of him, and the two became intimate. They had a "pretty good" relationship for a few months, until petitioner became concerned about respondent's interaction with her older daughter, Sophie. While respondent continued to cultivate a close friendship with Sydney—buying her things, taking her places, and, in general, making his relationship with her "fun"—he had little patience for Sophie. With Sophie, respondent was often tense and verbally insulting, and grew more so as time passed. Petitioner became particularly concerned about respondent's behavior with children one day when she heard a girl screaming in her living room. She entered to discover respondent laughing and pushing one of her daughter's 10-year-old friends to the floor with what respondent later referred to as a "Spock hold." The maneuver was obviously hurting the child. To get respondent to stop, petitioner had to yell at him and grab his arm. Petitioner expressed anger with respondent for his behavior, and respondent reacted defensively, describing the 10-year-old as deserving his treatment because she had been "mean" to him first and because she was a "hyper kid" generally. After that incident, because of her concerns about how respondent reacted to and handled children, petitioner asked respondent to move out.

Respondent apparently looked for another place to live but found no acceptable apartments. He therefore continued to live in petitioner's home. While living there, he continued to pick Sydney up at school and take her home. One day, without permission, he drove her to Grants Pass instead of taking her home. Petitioner was upset that he did so, primarily because she considered respondent's car unsafe. That and other disagreements over the children caused petitioner and

respondent to argue on an ongoing basis. Petitioner continued to press respondent to move out, which he finally did. About the time that respondent did so, the lease expired on petitioner's home and she and her children also moved into a new residence. At that point, which was about 10 months after he had moved in with her, petitioner told respondent that he should "move on with his life" and that her children did not want to stay in touch with him.

Respondent continued to contact the children, however. At least twice, he called them at home when petitioner was at work and, when he found out that they were alone, he came over uninvited. Because the children knew he was coming, they called petitioner, who came home. Respondent brought gifts for the children. In particular, he brought art supplies for Sydney, which she was especially fond of and had difficulty declining. Respondent stayed only a few minutes on those visits and left without incident.

A few months after respondent moved out, petitioner discovered that two dresses in her closet that she had not worn in some time had been shredded with scissors. Respondent had given petitioner both dresses as presents, and petitioner suspected respondent of destroying them after a fight they had some months before. Petitioner testified to her fear upon finding the dresses:

> "My stomach dropped, because I just—it felt like—it frightened—it was frightening to me that he could be that—it just seemed vicious to—just to cut up my clothes."

The incident also frightened Sophie, who considered it "creepy" and was scared at what else respondent might do. Respondent admitted to petitioner that he had cut the dresses after an argument that they had several months before. At the hearing on the SPO, respondent testified that he damaged the dresses so that petitioner would know he was capable of expressing anger. After finding the dresses, petitioner sent a letter to respondent, telling him that she had found the dresses and instructing him not to call or otherwise contact her family, and "not to come to our home ever."

For about a month, respondent did not contact either petitioner or her daughters. Then one day, when petitioner and Sophie were walking home, respondent drove up alongside them and offered them a ride. Petitioner told Sophie not to worry, because she felt respondent would not bother them with lots of other people around. Petitioner told respondent to leave them alone. Respondent smiled, asked her why she was being so unfriendly, persisted in trying to give them a ride, and wanted to know where Sydney was. When petitioner ignored him, he drove off, but Sophie believed he would be waiting at their home when they got there. She was right. When they arrived at their home, respondent was parked in front of the house. He asked again where Sydney was. Petitioner told him that Sydney was at a friend's house, but she would not tell him which one. Petitioner and Sophie then got in petitioner's car and left. When they came home later, respondent was gone.

In the months that followed, petitioner had limited contact with respondent. Petitioner urged respondent to obtain professional counseling, and she was hopeful that, as a result of counseling, respondent would leave her and her children alone. At one point, respondent approached petitioner in a parking lot, told her that he was really sorry for his behavior, that he was getting counseling, and that he "felt terrible about the fear that he had caused and was very upset that Sydney might think he was some kind of monster." He urged petitioner to let him visit her daughters so that they could see he was not a terrible person. Petitioner was very reluctant, but respondent assured petitioner that he was getting counseling and would not bother the family again if he could have that visit. Petitioner finally agreed to let respondent come to her home for a few minutes. Respondent brought gifts for petitioner's daughters, was very polite, stayed only a few minutes, and then left. Petitioner felt relieved, and felt safer because she thought that she and her daughters would not have to go "through this any more."

Not long afterwards, however, respondent called petitioner's home and left a message on the answering machine that he was coming over. He then arrived, uninvited. He visited briefly and brought gifts for petitioner's daughters, as he usually did. He asked to see some of

Sydney's artwork. Sydney showed him a picture of some mountains that she had drawn. Respondent told her that the mountains looked like "boobs," and that they specifically looked like petitioner's, Sophie's, and Sydney's "boobs." Petitioner considered the sexual comparison inappropriate and told Sydney to take the picture to her room and not to show any additional artwork to respondent. Respondent left soon afterwards. Shortly after that visit, respondent contacted petitioner, expressing a desire to remain friends. Petitioner wrote him a letter saying that she would think about it, but emphasizing to him that he should not try to see Sydney without petitioner's knowledge and that he should not come to the house uninvited or show up anytime when petitioner was not home.

During that time period, petitioner twice agreed to have lunch with respondent. The second time she did so, respondent said that the reason he wanted to have lunch with her was to tell her about his plans to move to Alaska and to ask her some questions that would help him with his counseling. When they met for lunch, however, respondent told her within the first few minutes that he was not going to Alaska after all and that he was done with counseling because his counselor had told him that it was petitioner, not him, who had problems. Petitioner was angry because she felt that respondent had manipulated her again, and she left without staying for lunch. She then wrote respondent and again told him not to contact her and not to come to her home.

A few weeks later, petitioner noticed that it was getting late in the day and Sydney, who was supposed to walk to petitioner's office after school, had not arrived. When she did arrive, she had candy and seemed nervous. When petitioner asked Sydney where she got the candy, Sydney first responded that she could not tell petitioner where she got it. Finally, Sydney explained that respondent saw her walking down the street by herself, had her get in his car, bought her some candy, sat with her in the car and talked awhile, then finally drove her to petitioner's office and dropped her off. Petitioner called respondent that night and, when he did not answer, left a message on his answering machine telling him that he did not have permission to pick up Sydney, that it was

not "okay" to do so, and to stay away from her family. After that incident, petitioner made special arrangements to ensure that Sydney never left school alone and that, instead, she was either picked up by another family member or went with a friend to the friend's house.

Based on that incident, friends encouraged petitioner to seek an SPO. Petitioner considered doing so but was afraid that it would make respondent mad and that the situation would get worse. During the next month, however, respondent continued to call the house. Petitioner answered the first of the calls, at which point respondent told her that he wanted to take Sydney to a baseball game. Petitioner again told respondent that he was not to see the children any more. Respondent reacted by telling petitioner that Sydney was "the only happiness that he'd had in his life in the last couple of years," and that he would pursue legal action to obtain visitation with her. Petitioner was shaken by how obsessed respondent was with Sydney. Petitioner did not answer any further calls from respondent, although she knew he made some because she could identify his calls using "caller ID." Respondent also called and talked to the children's father, petitioner's former husband. Respondent told the father how wonderful the children were and that he wanted to spend time with them without petitioner present. The children's father told respondent that it would not be acceptable to do so and, when respondent kept "pushing it," the father hung up the phone. Respondent called back 15 minutes later and became more insistent. The children's father finally told respondent to "stay away from my children, stay away from anything that has to do with my kids," and hung up a second time. Respondent did not call the father again.

Petitioner, proceeding *pro se*, then brought this action for a SPO. At the hearing, petitioner testified that she was seeking the SPO because she was frightened by respondent's obsession with Sydney and was concerned about her children's safety. She wanted the SPO so that respondent would not be able to come to their home, to petitioner's office, or to the children's school, which would help her feel safer. Respondent, who was represented by counsel at the hearing,

urged the trial court to take a different view of the events. According to respondent, petitioner and he were in a protracted on-again, off-again relationship in which she did not deny him contact with her or the children until after he threatened legal action. Respondent urged that petitioner was not seeking the SPO because of unwanted contacts by respondent or because petitioner genuinely feared for her safety or that of her children. Rather, in respondent's view, petitioner was using the SPO procedure merely as leverage to sever her relationship with respondent.

The trial court rejected respondent's position and determined that petitioner not only had established grounds for issuance of a SPO by the applicable preponderance standard, but, in fact, had shown "beyond a reasonable doubt" that there were grounds for a SPO to issue.[3] The trial court found that respondent made contacts with petitioner and her children after petitioner had told him that they wanted no contact with him. Further, the trial court declared that there was "no doubt in [the court's] mind that he's alarmed everyone in the family," that it was "objectively reasonable * * * in their situation to have been alarmed," and that the repeated and unwanted contacts had caused petitioner "reasonable apprehension regarding the personal safety of both herself and her immediate family." On appeal, respondent challenges both aspects of the trial court's reasoning. That is, respondent asserts that the evidence of "unwanted contacts" is insufficient and that, even if there was adequate evidence of unwanted contacts, those contacts did not create either subjective or objective alarm or coercion. For the reasons that follow, we agree with the trial court that the evidence amply supports issuance of the SPO.

■    The civil stalking statute authorizes a court to issue a SPO against someone who intentionally, knowingly, or recklessly makes repeated and unwanted contact with another person, or a member of that person's immediate family or household, causing that person to be alarmed or

---

[3] Petitioner originally brought three complaints for SPOs, one for herself and one for each of her daughters. The trial court consolidated the three complaints into one SPO with the mother as the petitioner and her daughters covered by the SPO as close family members.

coerced. ORS 30.866(1)(a). The contact may consist of, among other things, coming into the person's visual or physical presence, following the person, waiting outside the person's home, property, place of work or school, or sending or making written communications of any kind. *See* ORS 163.730(3) (providing definition of "contact" for both the civil and criminal stalking statutes); *Weatherly v. Wilkie*, 169 Or App 257, 259, 8 P3d 251 (2000). Additionally, a person seeking the SPO must prove that he or she in fact was alarmed or coerced as a result of the repeated and unwanted contacts, and it must be objectively reasonable for that person to have been alarmed or coerced. *See Weatherly*, 169 Or App at 259 (discussing subjective and objective components). Finally, the repeated and unwanted contacts must also cause the person reasonable apprehension regarding his or her personal safety or the safety of a member of his or her immediate family or household. ORS 30.866(1)(c).

Potential constitutional problems arise when the person seeking a SPO relies on contacts that involve expression. In that circumstance, to avoid constitutional overbreadth problems, the contacts must meet a more stringent standard than the one set out in the statute. *See State v. Rangel*, 328 Or 294, 300, 977 P2d 379 (1999); *see also Hanzo*, 152 Or App at 542. That more stringent standard requires the contacted person to prove that the contacts involve a threat that "instills in the addressee a fear of imminent and serious personal violence from the speaker, is unequivocal, and is objectively likely to be followed by unlawful acts." *Rangel*, 328 Or at 303. Contacts that do not involve expression need to satisfy only the less stringent statutory standard. *Boyd v. Essin*, 170 Or App 509, 514, 12 P3d 1003 (2000), *rev den* 331 Or 674 (2001).

Respondent argues that "few if any of the 'contacts' between [respondent and petitioner] qualify as 'unwanted contacts' under the SPO statutes" and that some of the contacts, such as phone calls threatening legal action to establish visitation, or asking to take Sydney to a baseball game, "cannot, as a constitutional matter, * * * form the basis for an SPO because [they] involve protected free speech." To be sure, as respondent contends, some of respondent's contacts

with petitioner and her daughters, such as their lunch meeting at a public restaurant and respondent's short visit with the children at their home with petitioner's permission, may not qualify as "unwanted." Also, some of the potential "unwanted" contacts, such as the phone call threatening legal action, involve expression. But if, disregarding the permissive contacts and the unwanted contacts involving expression, there were two or more nonexpressive, unwanted contacts with petitioner and her close family members, then petitioner's proof is sufficient to satisfy the unwanted contact element. *See* ORS 163.730(7) ("'Repeated' means two or more times."); ORS 163.730(5) ("'Immediate family' means * * * child."). On this record, we find that there were two or more nonexpressive, unwanted contacts.

The first such contact occurred before respondent moved from the family home, at which time respondent regularly drove Sydney from school to home with petitioner's permission. He exceeded that permission, however, when he took Sydney on a much more extended trip, from Ashland to Grants Pass and back, without petitioner's permission or knowledge. Another unwanted contact occurred when, after respondent and petitioner argued over something, respondent shredded petitioner's two dresses to express his anger. That conduct unequivocally qualified as an unwanted contact under the statute. *See* ORS 163.730(3)(j) (contact includes "[d]amaging the other person's * * * property").

In addition, at least two unwanted contacts occurred after respondent moved out of petitioner's home. In particular, after petitioner first told respondent not to contact her or her daughters, respondent pulled up alongside petitioner and Sophie as they walked home, then drove ahead, parked in front of their home, and waited for them. *See* ORS 167.730(3)(c) (contact includes, "[w]aiting outside the home, property, place of work or school of the other person or of a member of that person's family or household"). Another unwanted contact occurred when respondent saw Sydney walking alone after school, gave her a ride in his car, bought her candy, and talked to her for awhile before finally taking her to her mother's office. At the point that respondent initiated that contact with Sydney, petitioner repeatedly had directed respondent, both verbally and in writing, not to have

any contact with her children without her knowledge or permission. Those nonexpressive contacts suffice to satisfy the statutory requirement of repeated, unwanted contacts.[4] Because they do, we need not consider whether the unwanted expressive contacts, such as the phone calls, meet the more stringent standard required under *Rangel*. *See Boyd*, 170 Or App at 515 (where nonexpressive contacts were adequate to support SPO, court did not need to consider whether expressive contacts rose to the level that *Rangel* requires).

■■ Respondent next argues that, even if the record contains sufficient evidence of nonexpressive and unwanted contacts to satisfy the statutory requirement that respondent repeatedly made such contacts, those contacts did not give rise to the subjective and objective alarm required to support an SPO. With regard to subjective alarm, respondent contends that "[petitioner] never alleged that she was apprehensive that [respondent] would physically harm the family." *See generally* ORS 163.730(1) (" 'Alarm' means to cause apprehension or fear resulting from the perception of danger."); *Delgado v. Souders*, 146 Or App 580, 587, 934 P2d 113, *rev allowed* 326 Or 43 (1997) ("alarm" means apprehension resulting from the threat of physical harm to the victim or persons close to the victim). To the contrary, petitioner expressly testified that she was frightened by respondent's viciousness in shredding her dresses, so much so that it caused her stomach to "drop." The fact that petitioner's reaction came when she learned of the unwanted contact, even though the contact had occurred months before, does not take her reaction outside the scope of the statute. *See Schiffner v. Banks*, 177 Or App 86, 92-93, 33 P3d 701 (2001). Petitioner also testified that she had become fearful and apprehensive about her daughters' safety, particularly after respondent picked up Sydney, bought her candy, and only eventually dropped her off at petitioner's office, all of which occurred after petitioner had repeatedly told respondent to have no contact with Sydney. The genuineness of petitioner's fear was manifested by, among other things, the steps she took from that point forward to make sure Sydney would never be

---

[4] We note that the incident in which respondent drove alongside petitioner and her older daughter involved some dialogue between them, but we have considered it without considering any expressive component.

alone after school. As in *Boyd*, petitioner may not have cast her testimony in the exact phrasing of the statute and described herself as subjectively "alarmed," but we have no hesitation inferring from her testimony that she was so alarmed. *See Boyd*, 170 Or App at 517.

■        Finally, we also conclude that petitioner's alarm was objectively reasonable. As we have emphasized in other cases, unwanted contacts must be considered in the context of the parties' entire history. So viewed, contacts that "might appear innocuous when viewed in isolation often take on a different character." *Weatherly*, 169 Or App at 263; *accord Schiffner*, 177 Or App at 93; *Boyd*, 170 Or App at 518. Here, from the beginning of the parties' "relationship," respondent was particularly focused on Sydney, petitioner's nine-year-old daughter. Indeed, respondent developed a relationship with Sydney before doing so with any other member of the family. After moving into the family home, although he soon was at odds with both petitioner and her older daughter, and even with other children who visited the family, respondent maintained a "fun" relationship with Sydney and cultivated her friendship. After moving out, he stayed focused on her and disregarded the limitations that petitioner placed on his contact with Sydney. A reasonable parent would conclude, as petitioner did, that respondent was unduly obsessed with petitioner's then 10-year-old daughter. A reasonable parent also would be alarmed at the prospect that respondent would pick up that child from school, buy her things, and take her places in his car, all without the parent's permission and contrary to the parent's express directive to stay away from that child. Such circumstances alone would be enough for a parent reasonably to fear for the child's safety. That is particularly so here, where the evidence also demonstrates respondent's aggressive conduct destroying respondent's dresses in a moment of anger, and his immature reaction in painfully restraining the daughter's 10-year-old friend whom he considered to have been "mean" to him.

Considering the totality of the circumstances, we conclude that petitioner proved by preponderant evidence that respondent made repeated, unwanted nonexpressive contacts with petitioner and her daughters, that those contacts subjectively alarmed petitioner and caused her to fear

for her and her daughters' safety (particularly Sydney's), and that petitioner's alarm was objectively reasonable. The trial court therefore correctly issued the SPO.

Affirmed.