Submitted August 7, 2020, reversed February 3, 2021

## H. L. P.,
*Petitioner-Respondent,*

*v.*

## Jacob Eugene Russell JONES,
*Respondent-Appellant.*

## Clackamas County Circuit Court
## 19SK02159; A172564

481 P3d 415

Respondent appeals a judgment and permanent stalking protective order (SPO) prohibiting contact with petitioner. He argues that petitioner failed to demonstrate that he subjected her to two or more "qualifying" contacts. Specifically, he argues that it was not objectively reasonable for a person in petitioner's position to feel "alarmed" by the contacts, as required by ORS 30.866(1)(b). *Held*: The trial court erred in issuing a permanent SPO because petitioner failed to present evidence of at least two qualifying contacts under ORS 30.866(1).

Reversed.

Douglas V. Van Dyk, Judge.

Adam L. Dean and Dean Law Group, P.C., filed the briefs for appellant.

H. P. filed the brief *pro se*.

Before DeVore, Presiding Judge, and DeHoog, Judge, and Mooney, Judge.

MOONEY, J.

Reversed.

## MOONEY, J.

Several months after ending their romantic relationship, petitioner obtained a permanent stalking protective order (SPO) against respondent. Respondent appeals from the judgment entering the SPO, challenging the sufficiency of the evidence. We conclude that the trial court erred in granting the permanent SPO because the evidence was not sufficient to support it. We reverse the judgment.

Respondent does not request *de novo* review, and it is not warranted. *See* ORS 19.415(3)(b); ORAP 5.40(8)(c). We review the trial court's factual findings for any supporting evidence and its legal conclusions for legal error. *Miller v. Hoefer*, 269 Or App 218, 219, 344 P3d 121 (2015). Given respondent's challenge to the sufficiency of the evidence, "we view the evidence and all reasonable inferences that may be drawn from it in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record is legally sufficient to permit that outcome." *King v. W. T. F.*, 276 Or App 533, 537, 369 P3d 1181 (2016) (internal quotation marks omitted). We presume that the court resolved any disputed facts consistently with the outcome that it reached. *Elliott v. Strope*, 307 Or App 156, 157, 476 P3d 972 (2020). We draw the relevant facts from the testimony in the record, and we state those facts in accordance with the standard just described.

Petitioner and respondent dated for approximately 18 months—from the time they were seniors in high school until the end of their freshman year of college at Oregon State University (OSU). Respondent had difficulty accepting the breakup and, after petitioner told him that the relationship was over, attempted to get her to reconsider. In the 24 hours immediately post-breakup, he called her 103 times. Petitioner did not answer those calls, and she sent "at least one text message that said, 'Do not call me' or 'Stop calling me.'" During the next two weeks, respondent continued to call petitioner and also to send her numerous text messages. Respondent did not threaten petitioner. At one point, petitioner saw respondent walking in her direction as she was leaving one class and heading to another. At that point,

she "pushed" him, "physically mov[ing] [respondent] out of the way" and told him "[p]lease don't talk to me; I'm going to class." We refer collectively to those events as the "post-breakup phone/text message incidents."

Respondent contacted petitioner on June 14 while she was housesitting for a friend in Lake Oswego (house-sitting incident). She noticed a car enter the driveway at 1:50 a.m. and saw that it was respondent when he approached the glass front door. She opened the door and spoke briefly with respondent before asking him to leave. Respondent protested and showed her new cuts on his arm. She believed that the cuts were self-inflicted and that they had been made within the previous 48 hours. Petitioner told respondent that she would call the police if he did not leave, at which point he left. Petitioner would have been alarmed by anyone showing up at that hour, but it was especially "alarming" when respondent appeared there. Petitioner had previously told respondent that she would be housesitting at that location, but she was not sure whether she had told him that she would be there overnight.

Petitioner and respondent were each taking summer classes at Portland Community College (PCC). Petitioner had rearranged her class schedule to avoid contact with respondent. On August 1, after parking her car and while walking toward her class, petitioner noticed that respondent was parked in the same parking lot and that he was fol-lowing her (PCC parking lot incident). She was aware that respondent had a midmorning chemistry class that day, but she became concerned that he was moving toward her in the parking lot. Petitioner ran to her class and did not see respondent again that day.

On August 5, petitioner saw respondent outside of her place of employment. She called respondent's parents to report seeing him, and they told her that he had only been there to buy a bottle of water at a nearby convenience store (place of employment incident). On August 10, respondent's mother contacted petitioner to arrange for the return of cer-tain gifts respondent had given her (gift return incident). Petitioner agreed to meet with respondent's mother and return certain gifts.

Finally, on August 18, someone spray painted the word "pedophile" on the garage door of a friend of petitioner[1] and she believed that it was respondent who had done so (vandalism incident). There was a sideways "smiley face" next to that word and the inclusion of that symbol suggested to petitioner that respondent had done the spray painting. They had a "sort of inside joke[]" about "smiley faces." Soon after that incident, respondent sent a text message to petitioner's mother claiming that petitioner was "having sexual relations with a 63-year-old man" and that she had been drinking and driving (text to petitioner's mother incident). Petitioner denied being in an intimate relationship with her friend, denied drinking and driving, and was unable to explain how respondent would have known where her friend lived.

Petitioner was alarmed by respondent's contacts because she knew that he had "physically hurt people" in the past, referring to an incident in high school in which he "beat a kid to a pulp." In spring 2019, respondent told her to "shut up" or else he would pour a "very hot" cup of coffee on her. Although petitioner did not include it as an unwanted contact in her petition, she did describe that, during their breakup conversation, respondent "physically restrain[ed]" her by grabbing her arms and holding them against her sides. Also, respondent had previously "stalked" her, walking around campus trying to find her. Respondent had engaged in self-harm that he said he inflicted because of her. Respondent had access to multiple firearms at his house, including an "illegally modified assault rifle," and he had previously indicated a desire "to shoot people."

Petitioner sought and obtained a temporary SPO against respondent. She points to the six incidents just described in support of her petition, arguing that each one constituted unwanted contact that alarmed or coerced her or a member of her immediate family. The trial court held an evidentiary hearing on October 3 and, at the conclusion of the hearing, issued a permanent SPO against respondent.

---

[1] Petitioner's friend was a 63-year-old retired mechanic whom she met after breaking up with respondent. That friend had helped her with some work on her car.

In issuing that order, the trial court used a form that contained preprinted findings that tracked the required statutory elements, which the court adopted and, in addition, the court made the following findings from the bench:

> "The parties were in a relationship. The relationship ended in early June. The Respondent was extremely distraught, sending over a hundred text messages and showing up at Petitioner's door in the middle of the night to display cut marks on his arms, and plead with the Petitioner to continue the relationship. He left only after Petitioner threatened to call the police.

> "Thereafter, the Respondent made several attempts to contact Petitioner, as she testified, instilling in her a reasonable fear that he was stalking her.

> "Then, on August 18th, 2019 he spray—spray painted 'Pedophile' on the garage of Mr. Haggart, a mechanic who was helping Petitioner with her car.

> "Petitioner filed for a stalking protective order on August 21st. Respondent responded on August 23rd with a text to Petitioner's mother that accused her of prostituting with the mechanic and making other accusations that were equally disturbing and false.

> "Petitioner is a credible witness. Respondent is not a credible witness."

Although the trial court did not specifically designate which contacts it was relying on, it referred to the vandalism incident, the text to petitioner's mother, and the housesitting incident when it made its oral findings and concluded that respondent "intentionally, knowingly, and recklessly engaged in repeated unwanted contact with" petitioner, and that it was reasonable for petitioner to be alarmed by that contact.

Respondent now appeals the judgment, assigning error to the trial court's decision to issue the permanent SPO. He argues that the "contacts" do not qualify under ORS 30.866 to support issuance of a permanent SPO because (1) the expressive contacts were not threatening, (2) the non-expressive contacts would not reasonably generate apprehension for petitioner's personal safety, and (3) petitioner

initiated some of the contacts, leaving respondent without reasonable notice as to what type of contact was unwanted.

To obtain an SPO under Oregon's civil stalking statute,[2] a petitioner must establish the following elements by a preponderance of the evidence:

"(1)   that the respondent engaged in 'repeated and unwanted contact' with the petitioner;

"(2)   that the petitioner was subjectively alarmed or coerced by the contact and that such alarm or coercion was objectively reasonable;

"(3)   that the petitioner subjectively experienced apprehension about personal safety as a result of the contact and that such apprehension was objectively reasonable; and

"(4)   that the respondent acted with the requisite mental state."

*Retherford v. Wafula*, 305 Or App 344, 352, 471 P3d 786 (2020).

"Contact" is defined in ORS 163.730(3) and, as relevant here, includes "[c]oming into the visual or physical presence of the other person," "[f]ollowing the other person," or "[w]aiting outside the home, property, place of work or school of the other person or of a member of that person's family or household." Contact is "repeated" if it occurs "two or more times." ORS 163.730(7). The contact must be "unwanted," and it must cause "alarm." The contact must instill in the petitioner "apprehension or fear resulting from the perception of danger." ORS 163.170(1). "Danger" in this context means "a threat of physical injury, not merely a threat of

_____

[2]  ORS 30.866(1) provides:

"A person may bring a civil action in a circuit court for a court's stalking protective order or for damages, or both, against a person if:

"(a) The person intentionally, knowingly or recklessly engages in repeated and unwanted contact with the other person or a member of that person's immediate family or household thereby alarming or coercing the other person;

"(b) It is objectively reasonable for a person in the victim's situation to have been alarmed or coerced by the contact; and

"(c) The repeated and unwanted contact causes the victim reasonable apprehension regarding the personal safety of the victim or a member of the victim's immediate family or household."

annoyance or harassment." *Reitz v. Erazo*, 248 Or App 700, 706-07, 274 P3d 214 (2012). To "'[c]oerce' means to restrain, compel or dominate by force or threat." ORS 163.730(2).

ORS 30.866 requires proof of respondent's mental state—that the respondent acted "intentionally, knowingly, or recklessly respecting the repeated and unwanted nature of the contacts in question." *Delgado v. Sounders*, 334 Or 122, 132, 46 P3d 729 (2002). To act intentionally, in this context, means to "act with a conscious objective to engage in repeated and unwanted contact." *Id.* at 133. To act knowingly means to "act with awareness that [one] is engaged in repeated and unwanted contact." *Id.* And to act recklessly means to "be aware of and then consciously disregard a substantial and unjustifiable risk that [one] is engaging in repeated and unwanted contact," the risk of which "must be of such a degree that a reasonable person would not have disregarded it." *Id.*

Because speech is protected by Article I, section 8, of the Oregon Constitution, petitioner must demonstrate that any speech-based contact amounts to a "threat." *State v. Rangel*, 328 Or 294, 303, 977 P2d 379 (1999); *Retherford*, 305 Or App at 352. A "threat," in this context, is a "communication that instills in the addressee a fear of imminent and serious personal violence from the speaker, is unequivocal, and is objectively likely to be followed by unlawful acts." *Miller*, 269 Or App at 223. Protected speech that does not itself qualify as an unwanted contact can nonetheless be relevant as context for other, nonexpressive contacts. *Habrat v. Milligan*, 208 Or App 229, 237, 145 P3d 180 (2006).

With that legal framework in mind, we review the facts in the light most favorable to the trial court's implicit and explicit findings. We begin by noting that respondent's act of physically restraining petitioner by holding her arms during the breakup conversation might well qualify as a contact under ORS 163.730(2), but petitioner did not allege— and the court did not find—that that incident was one of the qualifying contacts supporting the SPO. And even assuming that the trial court properly considered that incident as a qualifying contact, the evidence does not support the existence of a second qualifying contact under ORS 30.866.

None of the parties' contacts that occurred at OSU in the two weeks following the breakup would cause a reasonable person to be alarmed. Petitioner testified that each contact took place during the day, in public, and without any threat to her physical safety. The phone calls and text messages, which undisputedly were expressive contacts, did not contain threats and were, therefore, protected because they would not unequivocally instill in petitioner a "fear of imminent and serious personal violence *** objectively likely to be followed by unlawful acts." *Rangel*, 328 Or at 303. And, while respondent's threat to pour "very hot coffee" on petitioner if she did not "shut up" might have been a qualifying contact, petitioner does not argue—and the court did not find—that it was. It appears that that threat predated the breakup and, without any history of violence between the parties, was likely an "impotent expression of anger" and not a threat of "serious personal violence." *See Brown v. Roach*, 249 Or App 579, 585, 277 P3d 628 (2012) ("[O]ffensive, hostile, and aggressive statements are not enough to satisfy the [*Rangel*] standard.").

While the PCC parking lot incident might constitute a "contact" under ORS 163.730(2) because respondent "follow[ed]" petitioner, it does not qualify because the conduct, as described, would not objectively cause alarm. Petitioner testified that she saw respondent staring ahead while seated in his car and that he exited his car and "followed" her as she was walking to class from the same parking lot. She then ran to the building, up the stairs, and into her classroom. She testified that respondent was, at his closest, 40 feet away from her. She did not testify that respondent ran after her or that he ran or moved quickly in any direction. She did not testify that he possessed any weapons, that he looked threatening, or that he said anything to her at all. It is not objectively reasonable for that encounter to cause a reasonable person "apprehension or fear resulting from the perception of danger." ORS 163.730(1); *see also Outlaw v. Richey*, 301 Or App 18, 36, 456 P3d 348 (2019) (rejecting an argument that "nonviolent words and conduct" would cause a reasonable person to anticipate "danger"). Accordingly, it is not a qualifying contact.

Next, petitioner argues that the housesitting incident was a qualifying contact because she "was so frightened she had to threaten to call the police to get [respondent] to leave." She further asserts that respondent knew that the contact was unwanted and that, given all of her knowledge of respondent's behaviors, her fear was reasonable. But petitioner told respondent that she would be housesitting at that location and, when he showed up at the front door and she saw that it was him, she opened the door and spoke with him. Even assuming that petitioner was subjectively alarmed when respondent showed her the fresh cuts on his arms, her alarm was not objectively reasonable. The fact that she threatened to call the police to "get him to leave" may support a finding that she was subjectively alarmed, but it would not make that alarm objectively reasonable. There was nothing about the interaction that night to suggest that petitioner's own personal safety or that of members of her household was at risk. Moreover, respondent's act of showing petitioner his self-inflicted cuts was itself expressive and was at most an "impotent expression[]" of anger or frustration." *Rangel*, 328 Or at 303.

Finally, we conclude that none of the other incidents at issue qualify as contacts sufficient to support the issuance of the SPO. The vandalism incident does not qualify as a contact because respondent never came into contact with *petitioner*. Damaging the property of a third party who is not a member of petitioner's household is not a qualifying contact under ORS 163.730(3). And respondent's false statements about petitioner's relationship with that third party, texted to her mother, are nonthreatening expressive contacts protected by the Oregon Constitution. *Rangel*, 328 Or at 306. That text message does not qualify as an unwanted contact under the SPO statute. And the place of employment incident and the gift return incident likewise are not qualifying contacts because they could not have caused reasonable apprehension for petitioner's personal safety.

Respondent did not react well to petitioner terminating her relationship with him. His calls and text messages were, no doubt, annoying and even troubling. But, even according to petitioner, they did not contain threats directed to her—or to anyone else. The trial court focused

on the vandalism incident, the associated text message to petitioner's mother, and the housesitting incident. As discussed, those incidents are not qualifying contacts. They are expressive and they do not convey serious threats of personal violence toward petitioner or any member of her household. Accordingly, the trial court erred in issuing a permanent SPO in this case.

Reversed.