Submitted September 15, 2022, reversed May 10, 2023

M. F.,
*Petitioner-Respondent,*

*v.*

Kevin BAKER,
*Respondent-Appellant.*

Washington County Circuit Court
21SK02545; A177203

530 P3d 142

Respondent appeals from a judgment imposing a permanent stalking protective order (SPO) against him, contending that the trial court erred because the speech-based contacts did not meet the heightened standard required for expressive contacts and because there were not two or more qualifying contacts. *Held*: The trial court erred in issuing the SPO. The speech-based contacts were harassing and hostile but did not meet the heightened standard required by the Oregon Constitution because they did not contain unequivocal threats of imminent and serious personal violence that were objectively likely to be followed by unlawful acts. The nonexpressive contacts were unwanted and met the requirement that they were subjectively alarming to petitioner, however, the evidence in the record does not establish that those contacts were also objectively alarming.

Reversed.

Oscar Garcia, Judge.

Christopher W. Brown and Kinney & Brown PC filed the brief for appellant.

No appearance for respondent.

Before Ortega, Presiding Judge, and Powers, Judge, and Hellman, Judge.

POWERS, J.

Reversed.

**POWERS, J.**

Respondent appeals from a judgment imposing a permanent stalking protective order (SPO) against him, raising a single assignment of error. Petitioner waived appearance on appeal. Respondent contends on appeal that the trial court erred by issuing the SPO because the speech-based contacts did not meet the heightened standard required for expressive contacts and because there were not two or more qualifying contacts. As explained below, because the record does not support that there were two or more qualifying contacts and because the speech-based contacts did not meet the heightened standard required by the Oregon Constitution, we reverse.

Respondent has not requested *de novo* review, and this is not a case in which such review is warranted. *See* ORAP 5.40(8)(c) (explaining that the court will exercise its discretion to review *de novo* "only in exceptional cases"); ORAP 5.40(8)(d) (describing a nonexclusive list of factors that the court will consider when determining whether to exercise discretion to conduct *de novo* review). Without *de novo* review, we review the trial court's factual findings for any supporting evidence and its legal conclusions for legal error. *H. L. P. v. Jones*, 309 Or App 108, 109, 481 P3d 415 (2021). In addition, because the trial court issued the SPO, we view the evidence and all reasonable inferences that may be drawn from it in the light most favorable to petitioner and assess whether, when so viewed, the record is legally sufficient to permit that outcome. *Id*.

We begin with a brief overview of the SPO framework under ORS 30.866, the civil stalking statute. To obtain an SPO under that statute, a petitioner must establish by a preponderance of the evidence:

"(1)   that the respondent engaged in repeated and unwanted contact with the petitioner;

"(2)   that the petitioner was subjectively alarmed or coerced by the contact and that such alarm or coercion was objectively reasonable;

"(3)   that the petitioner subjectively experienced apprehension about personal safety as a result of the contact and that such apprehension was objectively reasonable; and

"(4)   that the respondent acted with the requisite mental state."

*C. Q. R. v. Wafula*, 305 Or App 344, 352, 471 P3d 786 (2020) (internal quotation marks omitted).

ORS 163.730 defines specified terms that apply to the civil stalking statutory framework, including a nonexclusive list of actions that qualify as "contact." ORS 163.730(3).[1] Contact is "repeated" if it occurs two or more times. ORS 163.730(7). Contact causes "alarm" if it instills in the petitioner "apprehension or fear resulting from the perception of danger." ORS 163.730(1). "Danger" in this context means "a threat of physical injury, not merely a threat of annoyance or harassment." *K. R. v. Erazo*, 248 Or App 700, 707, 274 P3d 214 (2012). Each of the unwanted contacts, individually, must give rise to both subjective and objectively reasonable alarm or coercion. *J. C. R. v. McNulty*, 304 Or App 286, 288-89, 467 P3d 48 (2020).

When the contact involves speech—oral or written— "it must rise to the level of a threat to be considered a qualifying unwanted contact." *A. M. M. v. Hoefer*, 269 Or App

---

[1] ORS 163.730 provides, in part:

"(3) 'Contact' includes but is not limited to:

"(a) Coming into the visual or physical presence of the other person;

"(b) Following the other person;

"(c) Waiting outside the home, property, place of work or school of the other person or of a member of that person's family or household;

"(d) Sending or making written or electronic communications in any form to the other person;

"(e) Speaking with the other person by any means;

"(f) Communicating with the other person through a third person;

"(g) Committing a crime against the other person;

"(h) Communicating with a third person who has some relationship to the other person with the intent of affecting the third person's relationship with the other person;

"(i) Communicating with business entities with the intent of affecting some right or interest of the other person;

"(j) Damaging the other person's home, property, place of work or school;

"(k) Delivering directly or through a third person any object to the home, property, place of work or school of the other person; or

"(L) Service of process or other legal documents unless the other person is served as provided in ORCP 7 or 9."

218, 223, 344 P3d 121 (2015); *see generally State v. Rangel*, 328 Or 294, 303, 977 P2d 379 (1999) ("If the contact in question amounts to communication by speech or writing, only a threat will be sufficient to 'cause apprehension or fear resulting from the perception of danger,' as ORS 163.730 requires."). As we explained in *A. M. M.*,

> "[u]nder Article I, section 8, of the Oregon Constitution, unwanted contacts that involve speech are subject to a heightened standard of proof. To qualify as a predicate unwanted contact, any contact that involves speech must be a threat—that is, the sort of communication that instills in the addressee a fear of imminent and serious personal violence from the speaker, is unequivocal, and is objectively likely to be followed by unlawful acts. The kinds of threatening contacts that may support the issuance of a stalking protective order do not include the kind of hyperbole, rhetorical excesses, and impotent expressions of anger or frustration that in some contexts can be privileged even if they alarm the addressee."

269 Or App at 223 (internal quotation marks omitted).[2] Importantly, however, protected speech can be relevant as context for other, nonexpressive contacts despite not qualifying itself as an unwanted contact. *H. L. P.*, 309 Or App at 114.

With that legal framework in mind, we turn to the specifics of this case. Petitioner and respondent, who dated for about a year, amicably ended their relationship, but continued to talk regularly. After continuing to communicate with respondent for a few weeks, petitioner unequivocally told respondent to stop contacting her. Despite petitioner's request to cut off contact, respondent persisted by contacting petitioner both in person—at her apartment and church—and by phone, email, and social media for approximately six weeks until petitioner obtained an SPO. The first time, respondent left all the gifts that petitioner had given him on her doorstep when she was not home. The second time, respondent went to petitioner's apartment around 11:00 p.m.

---

[2] Article I, section 8, of the Oregon Constitution provides:

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

and spent several minutes knocking intermittently on the front door. Petitioner, who was inside with a friend, closed the back patio door to make sure that respondent could not get into the first-floor apartment and closed some blinds and windows "in [the] hopes that he would leave." After respondent received no answer at the front door, he walked around to the back patio, saw petitioner and her friend through the patio door, and yelled at petitioner about "loyalty" and then left. Petitioner called the nonemergency police line to report respondent.

Respondent also had contact with petitioner at her church on at least four different occasions. She had attended that church for over a decade, while respondent only began attending the church near the end of their relationship. On one occasion, respondent approached petitioner outside the church, and on the other three occasions, respondent sat within a few rows of petitioner, but they did not interact. There were other times that petitioner saw respondent's car in the parking lot and chose not to go into church. She explained that she "did not feel comfortable being in the same vicinity" and would end up going home and watching the service online. In the incident where respondent and petitioner interacted at church, petitioner recalled that, as she was talking with the head pastor, she saw respondent approach and started feeling "incredibly anxious and panicked." She explained, "I started getting light-headed and dizzy" and then cut off her conversation with the pastor and ran into the church.

In a different incident, after attending church and not seeing respondent's car there, petitioner drove away from church and noticed about two minutes later that respondent was directly behind her in his car. Petitioner proceeded through a traffic intersection, turned into a random neighborhood, and allowed respondent to pass without further incident.

Respondent also sent petitioner numerous harassing and hostile emails, texts, and social media messages, and respondent called her multiple times and left voicemails for petitioner, all of which made her feel unsafe. Respondent used multiple phone numbers and accounts, which prevented

petitioner from blocking the messages and calls. In particular, petitioner was concerned by a barrage of messages sent over a two-day period—including a message sent over social media where respondent referenced suicide: "If I kill myself right now, would you even care?" Petitioner was unaware of respondent's location when he sent those messages, and she called the police and spent the night away from her residence because she was afraid that respondent would be waiting at her apartment.

Based on those continued interactions, petitioner sought an SPO. At the hearing on whether to issue a permanent SPO, petitioner testified that respondent's contact at her apartment and at church made her feel unsafe.

When the trial court asked petitioner why she felt unsafe, petitioner explained:

> "Well, I don't feel safe because he keeps showing up at my apartment. Three different occasions he's shown up at my apartment unannounced after I've told him to stop contacting me.

> "Some of the times have been late at night or he will send me all these text messages from random-generated phone numbers of which because he had threatened to commit suicide, the police department had said that they will do a welfare check.

> "When they called me back and they said that his car was not there and he could not be located, I immediately went to, 'Well, then, where is he? Does that mean that he's here? Does that mean that he's waiting for me? Does that mean that he's hiding in the bushes? Does that mean any of these awful things that could happen?'"

The trial court followed up, asking again why she felt unsafe. Petitioner testified:

> "He's a threat to my safety because he's much larger than I am. He's a threat to my safety because what is my defense? He's a threat to my safety because normally where I would feel safe behind my dogs to protect me, I don't feel safe behind my dogs because they wouldn't protect me against him.

> "He's a threat to my safety because all of a sudden he's everywhere. He's now attending my church, he's now—he's

> making me feel afraid to be alone at my home; he won't stop contacting me; he won't—he's threatening his life. At what point would he then threaten my life?"

Summarizing her fear, petitioner explained, "because he continues to show up at my apartment * * * unannounced, will not leave, yelling into my bedroom door—or into the sliding glass window; the repeated and constant text messages; he's threatening his life, that is why I feel fearful."

The trial court issued a permanent SPO.[3] The trial court did not specify which of the contacts it relied upon but, in ruling from the bench, it referred to "a number of excessive contacts" including that respondent repeatedly went to petitioner's residence and places that petitioner was likely to be and respondent's message to petitioner about suicide. The trial court determined that, based on the totality of the circumstances, it was subjectively and objectively reasonable for petitioner to be alarmed and coerced by respondent's contacts.

On appeal, we conclude after reviewing the record that the trial court erred in issuing the SPO because petitioner failed to prove two or more qualifying contacts and that the speech-based contacts did not meet the *Rangel* standard. The nonexpressive contacts—when respondent went to petitioner's apartment and church and the incident in which respondent followed petitioner after church—were unwanted and met the requirement that they were subjectively alarming to petitioner. However, the evidence in the record does not establish that those contacts were also objectively alarming, *viz.*, creating an objectively reasonable fear of threatened physical injury. *See, e.g.*, *H. L. P.*,

---

[3] In entering the permanent SPO, the trial court used a form that contained preprinted findings that tracked the required statutory elements. However, the court did not check the box providing that it was objectively reasonable for a person in petitioner's situation to have been alarmed or coerced by respondent's contact, which is a statutorily required element, nor did the court check the box pertaining to speech-based contacts. Respondent has not assigned error to this discrepancy, and in light of the trial court's oral findings and its ultimate entry of the SPO, we understand the discrepancy to be a clerical error that does not inhibit appellate review. *See Yarbrough v. Viewcrest Investments, LLC*, 299 Or App 143, 158, 449 P3d 902 (2019), *rev den*, 366 Or 135 (2020) (explaining that a "clerical" error is one that causes a judgment, through oversight or omission, not to reflect what occurred in the proceeding that led to the judgment).

309 Or App at 115-16. There is nothing in the record that gives these nonexpressive contacts enough context to demonstrate how they create an objectively reasonable fear of threatened physical injury.[4] Likewise, the speech-based contacts—emails, texts, social media messages, calls, and voicemails—were harassing and hostile, but did not contain unequivocal threats of "imminent and serious personal violence" that were "objectively likely to be followed by unlawful acts," which is required to substantiate the issuance of an SPO. *A. M. M.*, 269 Or App at 223; *see, e.g.*, *D. W. C. v. Carter*, 261 Or App 133, 142, 323 P3d 348 (2014) (collecting cases applying the *Rangel* standard). Indeed, the message that the trial court called attention to in its findings—in which respondent mentioned suicide—did not unequivocally threaten imminent and serious personal violence against petitioner. Although such statements could meet the *Rangel* standard in other contexts, the context of each of respondent's unwanted and unnerving contacts with petitioner did not meet the legal threshold for issuance of an SPO.

Reversed.

---

[4] To the extent that the incident at petitioner's apartment also involved expressive conduct and that expressive conduct was the cause of alarm, we note that it would not be a qualifying contact under the *Rangel* standard because respondent's statement about "loyalty" was not an unequivocal threat of imminent and serious personal violence that was objectively likely to be followed by unlawful acts. *See State v. Hejazi*, 323 Or App 752, 761, 524 P3d 534 (2023) ("If the nonexpressive conduct causes the alarm, then *Rangel* does not apply; however, if the expressive conduct causes the alarm, then it must meet the *Rangel* standard of a qualifying threat.").