658 December 11, 2024 No. 886

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

A. A.,
*Petitioner-Appellant,*

*v.*

ANTHONY CUNIAL,
*Respondent-Respondent.*

Marion County Circuit Court
23SK00612; A181961

Jennifer K. Gardiner, Judge.

Argued and submitted October 4, 2024.

Rachael A. Federico argued the cause for appellant. Also on the brief were Legal Aid Services of Oregon and Emily Rena-Dozier and Oregon Law Center.

No appearance for respondent.

Before Shorr, Presiding Judge, Powers, Judge, and Pagán, Judge.

SHORR, P. J.

Vacated and remanded.

**SHORR, P. J.**

Petitioner appeals from a general judgment dismissing her stalking protective order (SPO) under ORS 30.866. Petitioner contends that the trial court erred in its determination that a prior period of voluntary contact precluded—as a matter of law—subsequent contacts from qualifying as unwanted and objectively alarming to petitioner. We agree, and therefore vacate and remand so that the court can reconsider its decision in light of this opinion.

Absent *de novo* review, which petitioner does not request, "[w]e review the trial court's factual findings for any supporting evidence and its legal conclusions for legal error." *H. L. P. v. Jones*, 309 Or App 108, 109, 481 P3d 415 (2021). We state the facts and all reasonable inferences that may be drawn from them in the light most favorable to the trial court's disposition. *Id.*

In 2012, petitioner and respondent began an intimate relationship and moved in together. They had two daughters together, before separating in 2017. During that separation, petitioner became pregnant by another man and had a third child, A, who was born in 2018. In March 2018, petitioner and respondent reconciled and resumed cohabitation. After A's birth, petitioner tried to end the relationship several times, moving out briefly in 2020. Both petitioner and respondent agree that the relationship was "always kind of rocky" and "on and off." In June 2021, petitioner moved out for the last time and ended the relationship.

Following their breakup, petitioner and respondent initially attempted to coparent harmoniously, but the relationship soon deteriorated. Respondent would repeatedly drive by petitioner's residence at all hours and bang loudly on her doors and windows, causing petitioner's neighbors concern about her safety. However, from June to October of 2022, petitioner and respondent took multiple voluntary outings together with their children. They took trips together to the beach, a fast-food restaurant, a theme park, and to visit petitioner's family in California. Interspersed between those voluntary family outings were several unwanted contacts that caused petitioner to feel unsafe. Then, in late

October 2022, petitioner "decided that she was finished." She blocked respondent's number and would not answer his calls. Respondent also confirmed that he "got cut off" in late October of 2022, following an argument with petitioner.

On November 4, 2022, respondent appeared to be following petitioner by car from her residence to multiple locations. At one point while she was parked, he knocked on the window, but she refused to open the car door and asked him to leave her alone. He remained outside her car for several minutes, accusing her of psychologically damaging her children. On November 24, 2022, respondent broke down petitioner's front door in front of their children. Petitioner then threatened to call the police if he did not leave. On December 9, 2022, respondent followed petitioner by car from her residence to an oil-service shop and insulted her there until she drove away. That same month, while petitioner was on a trip in Mexico, respondent drove by petitioner's home repeatedly, in a way that her neighbors found concerning. On January 13, 2023, respondent showed up while petitioner was waiting with A for the school bus. Respondent alternated between calling petitioner pathetic and telling A that he missed him, while petitioner "kept asking him to leave." On February 7, 2023, respondent saw petitioner at their daughters' school, followed her from the school to her residence, and "started banging on the door." She repeatedly pleaded with him to leave, said she did not feel safe, threatened to call the police, and then locked the door. Around this time, petitioner told respondent that if he kept coming by, she would report him for trespassing. On February 15, 2023, petitioner filed a petition for an SPO against respondent, and the court issued a temporary SPO.

At the subsequent hearing to determine whether the SPO should be made permanent, the trial court found that a "clear demarcation" in the relationship occurred in late October 2022 when petitioner "decided that she was finished." The court also "credit[ed] [petitioner's] testimony *** that she was exhausted because the way [respondent] treated her is exhausting. The constant beratements, the constant dragging the children along to degrade her in front of the children would be exhausting, and so she cut

off communication." The court understood that petitioner "didn't feel safe" due to respondent's "threats against her" and the "control and power exerted over her." However, the court ultimately dismissed the SPO. Although the court found repeated contacts and a "clear demarcation" in late October 2022 where petitioner did not want contact with respondent going forward, it questioned "whether or not [respondent] [was] sufficiently on notice" that contact was unwanted. Moreover, the court concluded that the earlier voluntary family outings before late October 2022 precluded it from finding that the later contacts occurring after November 1, 2022, objectively alarmed petitioner:

> "It's hard for the [c]ourt to organize that information in a way that would qualify for alarming fear of physical safety and repeated contacts.

> "And for those same reasons, it's difficult to evaluate the November contacts * * * as being contacts that would be objectively alarming for her physical safety because of the context in which they occurred; that being repeated communications to leave me alone, but then engaging in these family outings that are not incidental to shared parenting.

> "So for those reasons, I'm going to dismiss the stalking order."

Although the court dismissed the SPO, the court "struggled with" the decision because respondent's "behavior [was] unsettling" and scary. The court concluded, "I am in no way precluding [petitioner] from petitioning the Court for a stalking order * * * now that we have a clear mark. We have a clear mark in November going forward."

ORS 30.866 authorizes the issuance of an SPO against a person who "intentionally, knowingly or recklessly engages in repeated and unwanted contact with the petitioner." ORS 30.866(1)(a). "Repeated" and "unwanted" contact means that a petitioner must establish at least two instances where the respondent contacted the petitioner while "aware of a substantial and unjustifiable risk" that contact was unwanted, and then consciously "disregarded that risk when a reasonable person would not have done so." *Delgado v. Souders*, 334 Or 122, 134, 46 P3d 729 (2002). Additionally, a petitioner must prove that (a) he or she was

alarmed or coerced as a result of the contacts, (b) the alarm or coercion was objectively reasonable, and (c) the repeated and unwanted contacts caused "the petitioner reasonable apprehension regarding [his or her] personal safety." ORS 30.866(1)(a) - (c).

We understand the trial court to have found that a clear demarcation in the relationship occurred in late October 2022 and that, thereafter, repeated contacts occurred, causing petitioner subjective fear for her safety. We further understand the trial court's ruling to conclude that, in light of the prior period of voluntary contact from June to October of 2022, the post-demarcation contacts could not qualify—as a matter of law—as unwanted and could not have caused petitioner objectively reasonable alarm. We disagree and conclude that the prior period of voluntary contact did not categorically preclude the contacts from qualifying as unwanted and objectively alarming to petitioner.

We begin with whether the post-demarcation contacts could qualify as unwanted. A petitioner can establish that contact was unwanted by demonstrating that a respondent was subjectively "aware of a substantial and unjustifiable risk that the contacts in question [were] *** unwanted by the recipient, and then consciously and unreasonably disregard[ed] that risk." *Delgado*, 334 Or at 133. Here, the trial court found that petitioner was "finished" with respondent in October 2022. Thereafter, on November 24, 2022, respondent broke down petitioner's door. We have previously concluded that such damage to a petitioner's home or property "unequivocally qualifie[s] as an unwanted contact." *Pinkham v. Brubaker*, 178 Or App 360, 370, 37 P3d 186 (2001) (concluding that an unwanted contact occurred when the respondent shredded two of the petitioner's dresses, thereby damaging the petitioner's property).

After respondent broke down petitioner's door, respondent continued to make unwelcome contact with petitioner. In particular, on February 7, 2023, respondent followed petitioner to her home, banged on the door, and argued while she said she did not feel safe and threatened to call the police. Respondent's own testimony establishes that during that time period petitioner blocked respondent's

phone number, actively avoided contact, and threatened to have him "trespassed" from the property. That evidence was "surely sufficient to make [respondent] aware of a substantial risk that further contact was unwanted." *Bryant v. Walker*, 190 Or App 253, 257, 78 P3d 148 (2003), *rev dismissed*, 337 Or 585 (2004) (concluding that the petitioner's one spoken exchange with the respondent, when she told him to stop staring at her, was sufficient for the contacts to qualify as unwanted).

Nor do the prior voluntary outings during the turbulent period from June to October of 2022 legally preclude the subsequent contacts from qualifying as unwanted. *See D. A. v. White*, 253 Or App 754, 764, 292 P3d 587 (2012) (concluding that, even though the petitioner voluntarily continued to work with the respondent after a rift, that did not preclude subsequent threats from qualifying as unwanted contacts); *Pinkham*, 178 Or App at 370-71 (contacts occurring after the petitioner cut off contact qualified as unwanted, even though the parties had a previous romantic relationship and some voluntary on-and-off contact following termination of the relationship). We therefore conclude that the trial court erred in determining that, because of the prior voluntary contacts, the post-demarcation contacts could not qualify—as a matter of law—as unwanted.

We turn next to the issue of whether the trial court erred in concluding that, as a legal matter, the post-demarcation contacts could not be objectively alarming to petitioner in light of the prior voluntary outings. We have emphasized in prior case law that "unwanted contacts must be considered in the context of the parties' entire history." *Pinkham*, 178 Or App at 372; *see also M. C. H. v. Milligan*, 208 Or App 229, 237, 145 P3d 180 (2006) (considering the effect of unwanted contacts in the context of the respondent's persistent overtures and "directive and demanding style of interaction"). We have never concluded, however, that prior voluntary contacts preclude a petitioner from demonstrating that the petitioner is objectively alarmed by more recent offensive contacts.

Here, even though petitioner and respondent previously took several voluntary outings together with their

children, they also had a strained relationship in which respondent exercised "a lot of control and power" over petitioner. As noted, on one occasion when petitioner refused to let him in, respondent broke down her front door. He would repeatedly drive by petitioner's home at all hours, call her excessively, and berate her in front of her children. He also followed petitioner in her car and arrived uninvited at her residence, ignoring requests for him to leave. *See Bryant*, 190 Or App at 255, 257 (concluding that the petitioner's alarm was objectively reasonable where the respondent would follow the petitioner around in the store where she worked but never threatened her). Moreover, respondent's conduct caused petitioner's neighbors concern about petitioner's safety. *See M. C. H.*, 208 Or App at 239 (other people's concern for the petitioner contributed to the reasonableness of the petitioner's alarm). Considering the entire context of the parties' history, the prior voluntary outings do not legally preclude a finding that petitioner's alarm from the more recent contacts was objectively reasonable. The trial court erred in applying such a legal standard.

Having determined that the prior voluntary contacts do not, as a matter of law, disqualify subsequent contacts from being unwanted or objectively alarming to petitioner, we conclude that the trial court's dismissal of the SPO was premised upon legal error. We vacate and remand for the court to reconsider its decision in light of this opinion.

Vacated and remanded.